IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | |
| RICHARD BYRD | * | Case No.: 14-0186-GLR |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT RICHARD BYRD'S MEMORANDUM OF LAW IN SUPPORT OF
HIS APPEAL OF DETENTION ORDER AND
FOR AN ORDER GRANTING PRE-TRIAL RELEASE**

COMES NOW Defendant, Richard Byrd, by and through undersigned counsel, appeals the Detention Order dated May 16, 2014, detaining Mr. Byrd pursuant to 18 U.S.C. § 3142(e)(3)(A) pending trial, and in support thereof, states as follows:

### INTRODUCTION

On April 17, 2014, the United States District Court for the District of Maryland issued an arrest warrant for Mr. Byrd. He was charged with one count of Conspiracy to Distribute and Possess with Intent to Distribute Cocaine and Marijuana under 21 U.S.C. § 846. *See* Doc. 1. Mr. Byrd was arrested outside of his attorney's office in Phoenix, Arizona, and, pursuant to Fed. R. Crim. P. 5(c)(3), appeared before United States Magistrate Judge Michelle H. Burns of the United States District Court for the District of Arizona for a detention hearing/removal hearing on May 7, 2014, and May 13, 2014. Mr. Byrd was denied release in an opinion dated May 15, 2014. *See* Doc. 12-1.

### STANDARD OF REVIEW

"If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court,

the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly." 18 U.S.C. § 3145(b).  When acting on such a motion, the court reviews the Magistrate Judge's order *de novo*. *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992); *United States v. Stewart,* 19 Fed. Appx. 46, 47 (4th Cir. 2001); *United States v. Cutter*, 637 F. Supp. 2d 348, 350 (W.D.N.C. 2009). Thus, this Court makes "an independent determination of the proper pretrial detention or conditions of release." *Stewart*, 19 Fed. Appx. at 47.

## ARGUMENT

### I.   APPLICABLE LAW.

The Bail Reform Act ("Act") generally requires courts to impose the least restrictive conditions to ensure the defendant's appearance in court and authorizes courts to amend a bail release order to impose different conditions of release. *See* 18 U.S.C. § 3142(c). Any discussion of bail is founded on the presumption of innocence. *See Stack v. Boyle*, 342 U.S. 1, 4 (1951). The "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction." *Id.*  Thus, "in our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

When a defendant seeks to remain free pending trial, 18 U.S.C. § 3142(f) governs. The statute provides that the judicial officer shall hold a hearing to determine whether there are any conditions or combination of conditions that will reasonably assure the appearance of the person and whether the person poses a danger to the community. *See id.*  The judicial officer shall also take into account available information concerning the nature and circumstances of the offense charged, including whether the offense is a crime of violence; the weight of the evidence against

the person; the history and characteristics of the person, including the person's character, family ties, employment, past conduct, criminal history, record concerning appearance at court proceedings, and whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense; and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g). In making the determination as to whether any condition or combination of conditions of release will assure the defendant's appearance at trial, findings with respect to risk of flight must be supported by a preponderance of the evidence. *See id*.

Application of the pertinent standard, *rebuttable presumption*, and the above factors to this case favor Mr. Byrd's release on electronic home detention with GPS capabilities at his home address.[1] Mr. Byrd has (1) significant ties to the community, (2) he is regularly and gainfully employed, (3) he has obeyed and complied with all court appearances and release conditions in Arizona since **2011**, (4) he has demonstrated over the past 3 years while on release that he is not a flight risk, (5) he has a minor criminal history with no conviction in 16 years and no convictions for crimes of violence, and (6) this current indictment does not allege any violence.

---

[1] The Electronic Home Monitoring program currently in use by Pre Trial Services (hereinafter "PTS") in the District of Maryland is a highly successful alternative to incarceration pending trial and has an exemplary record of assuring a defendant's presence at trial. Were he to be admitted to bail, Mr. Byrd would wear a bracelet on his ankle. The device is about the size of a pager and is waterproof. It is linked electronically to a base station that is plugged into the person's home telephone. Once in place, the base station receives a signal from the bracelet and monitors the distance between the bracelet and the base station. If the wearer exceeds the approved distance from the base station, the base station sends a message to PTS reporting a violation. Officials then determine whether the violation was caused by an approved absence. If not, Officers then phone or visit the defendant's home. In any event, officers typically visit the defendant's home at least once per week unless the Court orders more frequent visits.

II.  **MR. BYRD IS A SUCCESSFUL BUSINESSMAN, ORGANIZING AND PRODUCING ENTERTAINMENT EVENTS THROUGHOUT THE COUNTRY.**

Mr. Byrd has been self-employed as an **event and branding specialist** for approximately fifteen years. *See* Exhibit 1 (Richard Byrd's Personal History). He organizes and produces lucrative entertainment events throughout the country and increases brand awareness for major companies, hiring celebrities to host or to make guest appearances at these events. *See id*.; Exhibit 2 (Newspaper Articles); Exhibit 3 (Flyers for 2013 NBA All-Star Events); Exhibit 4 (Courvoisier Contract); Exhibit 5 (Photographs from Events).[2] Mr. Byrd regularly hires well-respected and decorated police officers as security for his events. As is customary in his business and industry he regularly collects large amounts of cash at these events and regularly pays the police officers and others in cash.[3] Prior to becoming an event and branding specialist, Mr. Byrd was a promoter for Vision, a popular nightclub in Houston, Texas, and served as a Marketing Executive and buyer for Von-a-Don, a retail clothing store in Baltimore, Maryland.

Aware that he can provide those with lesser means with opportunities, he hosted an annual Thanksgiving dinner for the disadvantaged and homeless and gave out gifts during the holidays to underprivileged children. He has also collaborated with Sean "Diddy" Combs[4] and

---

[2] Exhibits 2-5 represent a mere sample of the voluminous documentary evidence that verify Mr. Byrd's legitimate employment and business. Deandre Byrd Entertainment, doing business with several well-known companies (like Courvoisier and Hennessey), produce numerous events around the country that attract thousands of people and numerous celebrities.

[3] Mr. Byrd pays many vendors and celebrities by checks. Because businesses like Mr. Byrd's is not located full-time in a particular city, many individuals, who perform services for his company, are reluctant to accept payment by checks once the event has concluded.

[4] Sean Jean Combs is a multi-millionaire American rapper, record producer, and actor known by his stage names Puff Daddy, P. Diddy, and Diddy.

hosted "Bad Boy"[5] weekends where he would give away 500 tickets to children with high GPAs to encourage them to maintain their GPAs and to strive for a higher education.

Mr. Byrd also fully supports his four children. Three of these children are enrolled in private schools, including Garrison Forest, an all-girls school located near Baltimore, Maryland, and Valley Forge Military Academy, an all-boys school located near Philadelphia, Pennsylvania. Both of these schools have rigorous admission requirements and demand excellence in education; both are geared towards preparing their students for top-level colleges. Mr. Byrd is determined and committed to continue to be an active, supporting father for his children.

### III.   MAGISTRATE JUDGE BURNS MADE INCORRECT FINDINGS AND CONCLUSIONS.

As a preliminary matter, although this Court must conduct a *de novo* review of detention, it is beneficial to understand that Magistrate Judge Burns' decision to detain Mr. Byrd was based on incorrect facts and conclusions.

Magistrate Judge Burns based her decision, in part, on alleged contradictory statements of Mr. Byrd and his wife, Stacie Byrd. Regarding Mr. Byrd's company name, Magistrate Judge Burns stated that Mr. Byrd and his wife provided contradictory company names. *See* Doc. 12-1 at 5:15. Mr. Byrd stated that his company's name is Deandre Byrd Entertainment and his wife stated that the company is LOC Marketing. These two statements are not contradictory because Mr. Byrd operates his event promotion business through both companies. Although Deandre Byrd Entertainment is his entity name, he regularly partners with LOC Marketing for his business. *See* Exhibit 6 (Recent Contract for Onyx Gentlemen's Club during the 2013 NBA All-star Weekend). Magistrate Judge Burns relied upon this alleged contradiction in the *company name* to deny Mr. Byrd's release in spite of the fact that the court acknowledged at the detention

---

[5]  Bad Boy Records is a multi-million dollar record label founded in 1993 by producer/rapper/entrepreneur Sean "Diddy" Combs.

hearing that Mr. Byrd stated that he regularly hires celebrities from the music and sports industries to host his events or make guest appearances and found that Mr. Byrd *produced documentation* during the detention hearing to *substantiate* these activities. Certainly the alleged contradiction in the company name, which is not a contradiction at all, should not carry more weight than Mr. Byrd substantiating his company activities through documentary evidence. Moreover, operating a legitimate business through multiple entities does not render one a flight risk or a danger to the community.

Magistrate Judge Burns also noted that Mr. Byrd and his wife gave "inconsistent" statements about his income. *See* Doc. 12-1 at 5:16.  Mr. Byrd stated that his income varies and his wife could not give definitive information about his income. *See* Doc. 12-1 at 3:10-11. These two statements are not inherently contradictory—they merely support the fact that as an event promoter, Mr. Byrd's income varies.  As set forth above, Mr. Byrd and his companies produce numerous events around the country that attract thousands of people and numerous celebrities. Far from an illegitimate business, these events are profitable for the venues, the vendors, the sponsors, the celebrity hosts, and, most importantly and relevant for this Court's analysis, profitable for Mr. Byrd.  *See e.g.* Exhibit 7 (Dunbar Armored Currency Shipment Page)[6].  Even if statements by the Byrds about his income could somehow be conceived as inconsistent – which they are not – a variance in income does not translate to a flight risk nor is it evidence that Mr. Byrd is a danger to the community.

Magistrate Judge Burns noted that Mr. Byrd denied ever using an **illegal** substance but his wife stated that he had obtained a *medical marijuana card* in California and had smoked

---

[6] Exhibit 7 is documentary proof and an example of large amounts of cash collected at Mr. Byrd's events being picked up by Dunbar Armored, an independent carrier that serves major banks, retailers and the Federal Reserve, and delivered to the bank to be deposited directly.

while in California approximately three years ago. *See* Doc. 12-1 at 3:6-9. Again, these two statements are not contradictory.  If Mr. Byrd obtained a medical marijuana card in California and only used marijuana in California, he did not use an **illegal** substance because he had authorization to do so. Thus, Mr. Byrd's statement is easily explained and reasonable and does not contradict his wife's statements.

In her written opinion, Magistrate Judge Burns noted that the government argues, Mr. Byrd "does not frequent the address that [he] claims to be his residence." *See* Doc. 12-1 at 5:17-18.  Mr. Byrd's business requires him to be on the road not only for the actual events, but also to maintain the vast network of relationships required to organize and host these events. The nature of Mr. Byrd's occupation does not change the location of his home address, and it certainly does not mean that Mr. Byrd is a flight risk if released under the conditions the defense propose.

Magistrate Judge Burns also relied on the fact that Mr. Byrd and his companies allegedly failed to file tax returns the last several years. *See* Doc. 12-1 at 5:25-6:1. Whether or not one files a tax return does not render him a flight risk (and most certainly not a danger to the community). Tax returns do not and should not support the argument that someone is a flight risk because it is not relevant to the analysis. More importantly, Magistrate Judge Burns' ruling on the failure to file tax returns does not address whether the conditions of release Mr. Byrd requests satisfies any concerns that Mr. Byrd is a flight risk or poses a danger to the community.

Additionally, the Government claims, and Magistrate Judge Burns relied on the fact, that an immigration detainer was lodged with the United States Marshals Service upon Mr. Byrd's arrest on the federal indictment. *See* Doc. 12-1 at 2:3-4. Assuming that this immigration detainer actually exists, it was based on a simple charge of possession of a handgun in **1993,** twenty-one years ago. According to the Government, the warrant was not issued until six years later, in

1999. Although Mr. Byrd has had contact with law enforcement since 1999, this warrant was not executed. To the contrary, U.S. Immigration and Customs Enforcement ("ICE") has taken no action. If this Court released Mr. Byrd under the terms requested, ICE will then have the opportunity to decide whether it wants to detain or release Mr. Byrd and can act accordingly.

Finally, Magistrate Judge Burns erroneously stated that Mr. Byrd "… asserts that … he has been released in the Maricopa County case for *several months*." *See* Doc. 12-1 at 3:16-17 (emphasis added). In fact, Mr. Byrd has been on **release for *three years*** (since February 2011), not three months, and has never failed to appear in court. More so than any speculation that the Government provides, this proves that Mr. Byrd understands that, if released, he must appear in court and, more importantly, proves that he can abide by the conditions of his release. Being on release for **three years** versus several months is significantly more relevant and supportive of release in this case and strongly supports that Mr. Byrd is not a flight risk or a danger to the community if released under the conditions proposed by the defense.

At no time in her written opinion does Magistrate Judge Burns address why the proposed conditions of release by the defense will not address any flight risk concerns or any potential danger to the community. There are conditions or combination of conditions that will reasonably assure the appearance of Mr. Byrd and protect the community.

### IV. MR. BYRD IS NOT A FLIGHT RISK.

When Mr. Byrd was arrested in Arizona in February 2011, he retained undersigned counsel and local counsel in Arizona. Mr. Byrd was originally released on bond with certain release conditions. Although Mr. Byrd was allowed to leave the State of Arizona, he appeared, as ordered, in court on numerous occasions over the past three years. Because Mr. Byrd complied with all release conditions, the Arizona court eventually exonerated his bond, *see*

Exhibit 8 (Order), while keeping in place the other conditions of release. Mr. Byrd continued to comply with all of those release conditions. The Arizona charges that have been pending for over three years have now been incorporated in this federal indictment. Mr. Byrd's history of compliance with pre-trial release strongly supports his appearance on these charges if released under the conditions proposed by the defense.

In **April 2013**, the Government executed several search and seizure warrants and recovered several hundred pounds of marijuana, kilos of cocaine and numerous handguns from the homes of individuals related to Mr. Byrd. In the affidavit in support of the search and seizure warrants, the Government alleged that this drug organization was run by Mr. Byrd. Specifically, in the 55-page detailed affidavit, the Government alleged that

> the Richard Byrd Drug Trafficking Organization ("DTO") is a poly-drug trafficking organization responsible for the procurement, transportation, distribution and sale of large amounts of marijuana, cocaine and heroin between the states of California, Arizona, Texas, North Carolina, Pennsylvania, Ohio and Maryland. Richard Byrd has been identified by several individuals, some of whom are willing to testify, as a major narcotics trafficker in the United States.

The affidavit goes on to say that the Government has been investigating Mr. Byrd's alleged DTO since **April 2011** and that the DTO is allegedly involved in drug importation, money laundering, currency transportation and drug distribution.

Mr. Byrd reviewed with counsel the complete affidavit in April 2013 and has thus been aware of this federal investigation for over a year and did not flee the country or flee at all. After reviewing the affidavit, undersigned counsel met with Government counsel last year and advised Government counsel that Mr. Byrd, if indicted, was ready and willing to surrender. In the past year, undersigned counsel met with and/or spoke with Government counsel numerous times regarding the status of the Government's investigation and regularly kept Mr. Byrd informed.

Mr. Byrd remained in regular contact with undersigned counsel and counsel in Arizona during the past year, including making numerous visits to both undersigned counsel's office in Maryland and co-counsels' offices in Arizona. In fact, Mr. Byrd was last in undersigned counsel's office the Friday before his arrest outside of co-counsel's office in Arizona the following Tuesday.  For more than a year, undersigned counsel and co-counsel in Arizona had advised Mr. Byrd he would likely be indicted. Undersigned counsel also advised Mr. Byrd that Government counsel had expressed concern he may flee.  Despite the pending likelihood of a federal indictment, Mr. Byrd did not flee. There can be no stronger evidence that Mr. Byrd is not a flight risk if released and released under the conditions proposed by the defense. As noted, Mr. Byrd has been on release in Arizona since February 2011 on a case in that has been subsumed into this federal case. Mr. Byrd has appeared in court in Arizona many times over the past three (3) years and *never* failed to appear. This proves that Mr. Byrd can abide by release conditions.

The Government makes much of the allegations that Mr. Byrd has used false identification in the past and was in possession of a false identification at the time of his arrest. Assuming the accuracy of these allegations, Mr. Byrd still did not flee. The Government has stated that Mr. Byrd was under electronic surveillance, but even with the benefit of surreptitious electronic surveillance, the Government has offered no evidence that Mr. Byrd contemplated fleeing the jurisdiction or country. The only evidence in this case is that Mr. Byrd has exhibited every intention to appear in court and fight these charges.

V.   **MR. BYRD DOES NOT POSE A DANGER TO THE COMMUNITY.**

Mr. Byrd has a minor record of convictions. His last conviction was for simple possession of marijuana sixteen (16) years ago in 1998. Prior to that conviction, he was last convicted 21 years ago of possession of a handgun and CDS in 1993. Mr. Byrd has never been

convicted of any crime of violence, and the indictment in this case does not allege any violence.[7] Therefore, he does not pose a danger to the community if released under the conditions of release proposed by the defense.

## CONCLUSION

In spite of the *rebuttable* presumption, Mr. Byrd is still presumed to be innocent and there are conditions or combination of conditions that will reasonably assure his appearance and protect the community. For the reasons stated above, Mr. Byrd respectfully requests that this Court release him on electronic home detention with GPS capabilities at his home address of: 3908 Ridgecroft Road, Baltimore, Maryland 21206.

Respectfully Submitted,

/s/ Kenneth W. Ravenell
Kenneth Ravenell
Murphy, Falcon & Murphy, P.A.
One South Street, 23rd Floor
Baltimore, Maryland 21202
410-539-6500

---

[7] Mr. Byrd denies the conviction for assault in 2002.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of June, 2014, a copy of the foregoing Memorandum of Law in Support of His Appeal of Detention Order and for an Order Granting Pre-Trial Release was served on all parties and their counsel via ECF.

/s/ Kenneth W. Ravenell
Kenneth W. Ravenell