**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. RDB-14-0186 |
| Plaintiff, | |
| vs. | |
| RICHARD BYRD, | |
| Defendant. | |

**RESPONSE TO GOVERNMENT'S MOTION FOR AN ORDER TO COMPEL
COMPLIANCE WITH SEIZURE WARRANT**

**AND**

**ALTERNATIVE MOTION FOR A *FARMER* HEARING**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND PROCEDURAL BACKGROUND.......................................................... 1

FACTUAL BACKGROUND............................................................................................. 3

    I.    MR. BYRD WON THE ARIZONA LITIGATION AT THE HEART OF THIS CASE AFTER TWICE PROVING GOVERNMENT MISCONDUCT .......................................................... 3

    II.    THE GOVERNMENT'S ACTIONS IN THIS COURT PLAINLY OVERLAP WITH THE ARIZONA LITIGATION ................................. 7

LEGAL ANALYSIS....................................................................................................... 9

    I.    THE WARRANT WAS ISSUED IN VIOLATION OF ARIZONA'S EXCLUSIVE JURISDICTION, DESCRIBES PROPERTY WHICH DOES NOT EXIST, AND COMPLIANCE WITH IT IS IMPOSSIBLE............ 9

        A.    The District Court Could Not Exercise Jurisdiction Because The Res Was Subject To The Exclusive Control Of The Arizona State Courts .................................................................................... 10

        B.    The Warrant Describes A *Res* Which Largely Does Not Exist And Which Cannot Be Seized .......................................................... 11

    II.    EVEN ASSUMING THAT WHAT THE GOVERNMENT SEEKS IS A RESTRAINING ORDER UNDER § 853(e)(1)(a), MR. BYRD IS ENTITLED TO A HEARING TO ESTABLISH THAT THE FUNDS ARE NECESSARILY AND PROPERLY USED TO RETAIN COUNSEL OF HIS CHOICE ........................................................... 13

        A.    Mr. Byrd Needs the Restrained Assets To Retain Counsel .................... 14

        B.    The Restrained Property Is Not Subject To *In Rem* Forfeiture............... 15

            1.    There Is No "Substantial Connection" Between The Arizona Judgment Funds And The Crimes Of Which Mr. Byrd Is Accused .......................................................... 15

            2.    Both Of The Probable Cause Findings Upon Which The Government Relies Are Defective ............................................. 16

                a.    The Property About Which The Court Found Probable Cause Did Not Exist At The Time Of The Application or Indictment ............................................... 16

b.     The Seizure Warrant Was Based On False Information Claiming That The Arizona Superior Court Did Not Address The Merits Of The Seizure And Did Not Hear Evidence Of Probable Cause (Or The Lack Thereof) ........................................................ 17

C.     The Government Is Collaterally Estopped From Arguing That The Property Is Subject To Forfeiture ........................................................ 19

D.     Pre-Trial Seizure Of Substitute Assets Is Impermissible Under Fourth Circuit Law And Prohibited By The U.S. Constitution .............. 21

CONCLUSION ................................................................................................... 24

## INTRODUCTION AND PROCEDURAL BACKGROUND

Justice Sutherland wrote many years ago that while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).  Simply by being that rare defendant willing to mount a defense, Mr. Byrd has been subjected to foul blow after foul blow, through the admittedly coordinated efforts of police and prosecutors first in Arizona and now in Maryland.  The Government's Motion to Compel (the "Motion") is the latest foul blow.  We respectfully ask that this Court ensure that the Motion is also the last foul blow.

The Motion is transparently aimed at (again) preventing Mr. Byrd from retaining counsel of his choosing to defend against the serious allegations the Government has made.  On October 7, 2015, in a letter which the Motion referenced in passing, undersigned counsel reiterated Mr. Byrd's position that "the money paid to Mr. Byrd in partial satisfaction of the judgment [in the Arizona forfeiture case] is rightfully his to use . . . [as is] the money still owed to him under the Arizona judgment."  [Exhibit ("Ex.") A, Letter from J. Cabou to Richard Kay and Jim Warwick, Oct. 7, 2015 ("October 7 Letter") at 2]  The October 7 Letter went on to specify that Mr. Byrd intended "to use the entirety of the Arizona Judgment Funds to retain [Perkins Coie] and the Findling Law Firm of Atlanta . . . to represent Mr. Byrd [in this case.]" [1]  [*Id.*]  The October 7 Letter closed by asking the Government for its response "as soon as possible" and by noting that if the parties could not "reach an agreement on this issue" the Government should "expect us to file a motion for appropriate relief with Judge Bennett."  [*Id.*]  No

---

[1]     Mr. Byrd seeks, and this litigation thus properly concerns, *only* the assets referred to in the October 7 Letter as "The Arizona Judgment Funds."  In other words, the only assets to which Mr. Byrd seeks access to pay for counsel are "funds paid, or still owed, to Mr. Byrd as a result of the judgment in his favor in the Arizona Superior Court."  *See* Ex. A, October 7 Letter at 1.  As set forth in further detail below, the total amount of the Arizona Judgment Funds is $1,049,818.06.  Ex. A at 5 (listing assets).

response was ever received to the October 7 Letter; the Government seems to have instead filed the Motion.

As relevant here, the Motion principally seeks an order "that directs the law firm of Perkins Coie to comply with a valid seizure warrant pertaining to funds and vehicles in their [*sic*] possession." [Motion (Doc. 223) at 1]  But, as explained previously to the Government and as set forth in detail below *there is no valid seizure warrant* pertaining to funds in the possession of Perkins Coie.  The seizure warrant in question, Seizure Warrant 13-1683 BPG (the "Warrant"), is legally void first because, at the time the Warrant was issued, this Court did not and could not exercise jurisdiction over the *res* it sought to seize.  [*See* Ex. B, Warrant]  Furthermore, the Warrant, even if facially valid, is of no practical effect because it describes a *res* which is neither in the custody of Perkins Coie LLP, nor in the custody of any Arizona agency.  In fact, the *res* described in the Warrant, including several items of "U.S. Currency" seized at various times in various places, ceased to exist long ago.

Furthermore, none of the funds held by Perkins Coie come from anything but a payment in partial satisfaction of the Arizona Judgment, signed by the Director of Administration and Governor of Arizona, of $763,898.06 (plus accrued interest) from the Arizona state treasury, specifically from the anti-racketeering fund.  [*See* Ex. C, State of Arizona Check #5925006, Apr. 26, 2013][2]  Put differently, the money held by Perkins Coie came straight from the State of Arizona's anti-racketeering fund, was paid by check, was paid in partial satisfaction of a final judgment, and the Government's description of those funds, either as "traceable to drug offenses" or as "currency" is belied by the facts.  The Arizona Judgment Funds still owed to Mr. Byrd presumably would be paid the same way.  *See* Ariz. Rev. Stat.

---

[2]      The Check is drawn on Fund # 3123, which is the Arizona State Anti-Racketeering Fund.  *See, e.g.,* *State of Arizona Executive Budget* (2016) at 323 available at http://azgovernor.gov/file/1371/download?token=zP0GrCs9.

§ 13-2314(A) (providing that awards against the State in racketeering cases should be paid from anti-racketeering fund).  At bottom, the Arizona Judgment Funds with which Mr. Byrd seeks to retain counsel of his choosing "were, or should be paid to him by the State to satisfy an enforceable judgment."  [Ex. A, October 7 Letter at 2].

The relief the Government's Motion seeks is unclear.  But, to the extent the Government seeks enforcement of the Warrant, compliance with the warrant is impossible.  Not only is the Warrant invalid, but also it purports to authorize the seizure of non-existent property.  Moreover, assuming that what the Government seeks is a restraining order under 18 U.S.C. § 853(e)(1)(A), Mr. Byrd is, at a minimum, entitled to a hearing where he would establish (1) that he cannot afford to pay a lawyer without the Arizona Judgment Funds, and (2) that the Arizona Judgment Funds are not connected to the crimes of which he is accused.  At most the Arizona Judgment Funds are substitute assets, which cannot be constitutionally restrained pre-trial.

## FACTUAL BACKGROUND

**I.   MR. BYRD WON THE ARIZONA LITIGATION AT THE HEART OF THIS CASE AFTER TWICE PROVING GOVERNMENT MISCONDUCT.**

The Government has now told two judges in this district, Magistrate Judge Gesner in the Warrant Application and your Honor in the Motion, that the Arizona forfeiture action was decided in favor of Mr. Byrd "based on procedural issues."  [Motion (Doc. 223) at 2;  Ex. D, Warrant Application at 8]  Not true.[3]

---

[3]      The Government here has done precisely what the Court of Appeals noted the State of Arizona did previously.  *State v. Byrd*, 2015 No. 1 CA-CV 13-0181, WL 3468396, at * 4 n.12 (Ariz. Ct. App. May 28, 2015) ("[T]he superior court found the State was not forthcoming with all the pertinent information [in its *ex parte* warrant application to that court].")

In Arizona, Richard Byrd faced off twice with prosecutors and law enforcement officers over the allegations at the heart of this case.  He won both times because prosecutors and officers cheated both times.  First, in 2011, the State of Arizona Attorney General's Office (the "AGO"), working with federal task force officers, including officers in Baltimore as stated in the Warrant Application, brought a civil forfeiture case against him in Arizona Superior Court (Maricopa County) (the "2011 Case") seeking to forfeit over a million dollars of his property.  After vigorous litigation, the State of Arizona "voluntarily" dismissed the case on the eve of a hearing at which it was sure to lose, and Mr. Byrd was awarded his attorneys' fees as the prevailing party.  [Ex. E, Order of Oct. 2, 2012 Granting Fees in CV2011-005949]

As Mr. Byrd only later learned, though, the State's decision to dismiss the 2011 Case was merely a tactical gambit; after its "voluntary" dismissal of the 2011 Case, it immediately filed a new case in Maricopa County Superior Court seeking to forfeit the *exact same* property seized in the 2011 Case.  That case, numbered CV2012-000121 (the "2012 Case"), was also extensively litigated. Eventually, over the State's opposition, the Superior Court held a three-day evidentiary hearing in the 2012 Case on the threshold question of whether probable cause existed for the initial seizure of Mr. Byrd's property.  During the hearing, many of the sharp, unlawful tactics of the police and prosecutors pursuing Mr. Byrd came to light:

- officers testified that they had lied in prior filings to the Court,[4]

---

[4]     For example, the lead agent, Special Agent Steve Adelstein eventually admitted that, despite the fact that he was put forth as the "Seizing Officer" by the State in its papers and despite the fact that the Notice of Seizure for Forfeiture recited that he had personally seized property from Mr. Byrd, these and other statements regarding the circumstances of the seizures of property were "false."   [Ex. F, Hearing Transcript ("TR") 11/27/2012 at 138:25-139:9].  Special Agent Adelstein actually had nothing to do with the seizures.  *Id.*

- officers admitted an unlawful attempt, orchestrated by prosecutors, to prevent judicial review of their seizure with a never-before-seen attempt to have a police officer, instead of a judge, make a finding of probable cause based on the written narrative of other officers,[5] and

- prosecutors confessed to withholding from another judge of the same court from whom they sought a subsequent warrant for the same property "the circumstances of the State's dismissal of the first forfeiture action (i.e., that the State dismissed to avoid a return of the property), that a civil department judge still had under advisement Defendant's emergency motion for release of property, or that Defendant had filed, about 71 hours prior, an Application for Order to Show Cause under the dismissed cause number—the only cause number available to Defendant —in his continuing effort to get his property back."

[Ex. G, Order Dismissing Case in 2012 Case at 5]

After the hearing, the Superior Court ordered both sides to submit comprehensive post-hearing briefing.  Mr. Byrd's briefing not only chronicled the course of misconduct by law enforcement that eventually resulted in dismissal with prejudice, but it also went item-by-item through the State's list of seized property and explained why the State, despite being given a multi-day hearing on the issue, had failed to establish probable cause for seizure as to various items.  [*See* Ex. H, Claimant Richard Byrd's Closing Argument Brief (the "Closing Brief") at i-iii (table of contents listing arguments including

---

[5]     [Ex. F, TR 11/27/2012 at 128:21-129:1; 136:9-11 (Special Agent Adelstein testifying that his "re-seizure" of property was done at the specific request of the prosecutor, who asked him to substitute his judgment for that of a judge and review "a draft affidavit involving observations and conclusions and allegations by officers other than [himself] to determine just based on that affidavit whether probable cause remained for forfeiture of those items.")]

itemized arguments as to probable cause)]   Among the issues discussed in the Closing Brief, was a false allegation that features prominently in the Government's Warrant Application before this Court: the claim that "Byrd apparently did not have a legitimate source of income during [2010-2013]." [*Compare* Ex. D, Warrant Application at 9 *with* Ex. H, Closing Brief at 19 (summarizing detective's testimony as concluding that "Mr. Byrd has no 'legitimate' source of income," noting that testimony and evidence also established numerous entertainment events in which Mr. Byrd was "directly involved" as a promoter, and noting that detective admitted he had not considered in reaching his conclusion 138 separate documents, dating back to 2004, establishing significant income for Mr. Byrd.)]

After considering the briefing for two months, the Superior Court concluded that "the interests of justice require dismissal of the Forfeiture Complaint with prejudice because of the State's violation of Defendant's due process rights."  [Ex. G, Order of Dismissal in 2012 Case at 8; *see also, id.* at 9 ("[T]he State violated [Mr. Byrd's] Due Process rights by the combination of violating Arizona's forfeiture statutes and its conduct to delay resolution for an unreasonable, excessive period of time.")]  Final Judgment was entered in favor of Mr. Byrd on all claims and against the State on all claims.  [Ex. I, Final Judgment in 2012 Case]   And, Mr. Byrd was again awarded his attorneys' fees against the State of Arizona.  [Ex. J, Order on Attorneys' Fees in 2012 Case]

When the State appealed, the Court of Appeals, among other things, explicitly declined to disturb the Superior Court's finding that the State "was not forthcoming" with the Superior Court about the facts underlying the seizure of Mr. Byrd's property, *State v. Byrd,* WL 3468396 at *4 n.12, and the Court of Appeals held that "[t]he repeated violations of the Arizona forfeiture statutes

perpetrated by the State exemplify the extreme circumstances where dismissal with prejudice is appropriate." *Id.* at ¶ 15.

## II.    THE GOVERNMENT'S ACTIONS IN THIS COURT PLAINLY OVERLAP WITH THE ARIZONA LITIGATION.

After final judgment was entered in the 2012 Case, and while the appeal of that matter was pending, on July 12, 2013, Magistrate Judge Gesner issued the Seizure Warrant which the Government alleges Perkins Coie has failed to comply.  It is clear that the Government sought the Warrant because it feared that Mr. Byrd would have assets as a result of the Arizona Judgment.

Meanwhile, Mr. Byrd's appeal remained pending at the Arizona Court of Appeals until Spring 2015.  During that time, the Government indicted Mr. Byrd in April 2014 and then, on July 14, 2014, returned a Superseding Indictment charging offenses under 21 U.S.C. § 446 and 18 U.S.C. § 1956(h). [Ex. K, Indictment; Ex. L, Superseding Indictment]  The Superseding Indictment also provided notice that the Government intended to seek the forfeiture of proceeds traceable to drug offenses under 21 U.S.C. § 853(a)(1) and money laundering pursuant to 18 U.S.C. § 981(a)(1)(A) and that it would seek forfeiture of certain *substitute assets*.  Notably, the Superseding Indictment only listed the assets the Government seeks here as  potential substitute assets.  Nowhere in the first or second indictments that the Government sought against Mr. Byrd did it allege that the assets they now seek were themselves traceable to an offense.  To the contrary, the Superseding Indictment affirmatively alleged that all property seized in 2011 by the Arizona authorities was "substitute property pursuant to 21 U.S.C. § 853(p)."  Put differently, in seeking the Superseding Indictment, the Government must have told the grand jury that "the property representing direct proceeds of illegal activity is unavailable" *United States v. Oregon,* 671 F.3d 484, 487 (4th Cir. 2012) (citing 21 U.S.C. § 853(p)).  Therefore, the

Government also told the grand jury, it "instead s[ought] the forfeiture of [the] property of [the] defendant up to the value of the property that would otherwise be subject to forfeiture." *Id.*

Then, strikingly, the Government did almost exactly what the Arizona superior and appellate courts found that the Arizona authorities did years ago: it engaged in a series of procedural maneuvers transparently designed to frustrate Mr. Byrd's attempts to test the Government's allegations and otherwise exercise his rights. Only this time, the Government acted with the clear and specific purpose of denying him access to funds needed to hire counsel of his choosing.

Only *after* the October 7 Letter and, quite plainly, in direct-yet-*ex-parte* response to it, the Government suddenly changed its story to the grand jury and its prior story in this case, claiming that the funds with which Mr. Byrd seeks to retain counsel were the direct proceeds of illegal activity. First, more than a year after the Superseding Indictment, on October 14, 2015, the Government filed an Information which, for the first time, alleged that the Arizona Judgment Funds were traceable to Mr. Byrd's alleged crimes. This Information was filed the exact same day as the Government's Motion.[6] Then, perhaps because the Government could not secure time with the grand jury more quickly or perhaps because of the then-approaching hearing before this Court, the Government went back to the grand jury on October 20, 2015 for the Second Superseding Indictment. [Ex. M, Second Superseding Indictment] Transparently, a principal reason for that Second Superseding Indictment was, and remains, to allow the Government to argue in these proceedings that the grand jury, too, has now found

---

[6] Presumably, the Government filed the Information for the sole purpose of allowing it to argue in the Motion that the Arizona Judgment Funds are themselves forfeitable *in rem* as proceeds of criminal activity. Otherwise, of course, the Government's sole claim to seize or restrain them would be based on the far-more-constitutionally-suspect idea that it can seize substitute assets pre-trial even if those are, as they are here, the only funds available to hire counsel.

probable cause to exist to forfeit directly, rather than as substitute assets, the funds at issue here and other property seized in Arizona in 2011.

The Government now asks for an order compelling compliance with the federal seizure warrant. Specifically, the Government requested an order that "(1) directs the law firm of Perkins Coie to comply with a valid seizure warrant pertaining to funds and vehicles in their possession; (2) that directs the State of Arizona to turn over to the U.S. Marshals Service certain assets in the State's possession; and (3) that directs the U.S. Marshals Service to hold the assets that are turned over . . . pending further order of this Court."   [Motion (Doc. 223) at 1]   For the reasons explained below, the Government should be denied the relief it seeks and Mr. Byrd should be granted access to the Arizona Judgment Funds for the sole purpose of retaining counsel of his choosing.

## LEGAL ANALYSIS

## I.  THE WARRANT WAS ISSUED IN VIOLATION OF ARIZONA'S EXCLUSIVE JURISDICTION, DESCRIBES PROPERTY WHICH DOES NOT EXIST, AND COMPLIANCE WITH IT IS IMPOSSIBLE.

Again, on July 12, 2013, Magistrate Judge Gesner issued a seizure warrant against some, but not all, of the assets seized by the State of Arizona in its civil forfeiture action.  This warrant was issued before any indictment was filed against Mr. Byrd and was issued *in rem*, against Mr. Byrd's property.

To the extent the Government seeks enforcement of the Warrant, compliance with the warrant is impossible.  Not only is this warrant invalid, but also it purports to authorize the seizure of property that no longer exists.

**A.    The District Court Could Not Exercise Jurisdiction Because The *Res* Was Subject To The Exclusive Control Of The Arizona State Courts.**

First, the district court's attempt to exercise *in rem* jurisdiction over the *res* in the seizure warrant was improper.[7]   "[A] federal court may not exercise jurisdiction when granting the relief sought would require the court to control a particular property or *res* over which another court already has jurisdiction."   *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 231 (4th Cir. 2000).   This rule applies "in rem or quasi in rem cases" where "two courts [are] exercising jurisdiction over the same res." *Id.*; *see also Kline v. Burke Construction Co.*, 260 U.S. 226, 229 (1922) ("[W]here the [in rem] jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same *res* to defeat or impair the state court's jurisdiction.").   In violation of this rule here, at the time the district court issued its *in rem* seizure warrant purporting to exercise jurisdiction over the listed property, the Arizona courts maintained exclusive jurisdiction over that *res*. *See* Ex. D, Warrant Application at 10 (acknowledging that "the Arizona Court of Appeals" issued an order that was "still pending and in effect" governing the property and still in effect" as of the date of the Government's application for seizure warrant).]

As the Seventh Circuit held in voiding a federal seizure presenting strikingly similar facts to those present here, the federal "government may not simply assert jurisdiction over the *res* because it is concerned with losing money or having money disbursed. These concerns do not give either the government or the district court the right to improperly assert jurisdiction over property which is under state court jurisdiction or to circumvent the law of jurisdiction." *United States v. $506,231 in U.S.*

---

[7]    Additionally, the warrant was never properly served.  Federal DEA agents served the warrant on undersigned counsel on July 23, 2013.  While undersigned counsel represented Mr. Byrd at the time, he was not authorized to accept service of any document from the federal government on Mr. Byrd's behalf and he informed the agents of precisely that.  The government took no other actions to serve the warrant on Mr. Byrd or anyone else authorized to accept service on his behalf.

*Currency,* 125 F.3d 442, 450-51 (7th Cir. 1997)  (holding that district court lacked jurisdiction over money seized by State court but ordered returned to claimant after federal authorities tried to seize same property to avoid the return to claimant, dismissing case, and ordering money returned to claimants).  The Government here simply ignored this rule, telling Judge Gesner only that that its warrant application "[was] not affected by any findings in [the Arizona] case."  [Ex. D, Warrant Application at 8 (citing nothing)]

This Court, in issuing the Warrant, violated this rule, wrongly exercising jurisdiction over the same property which was then exclusively under the jurisdiction of the Arizona courts.  *See Al-Abood ex. rel. Al-Abood*, 217 F.3d at 231.

> **B.** **The Warrant Describes A *Res* Which Largely Does Not Exist And Which Cannot Be Seized.**

Perhaps most obviously, the Government cannot force compliance with the Warrant, because the "currency" it identifies no longer exists.  "At its core, the Fourth Amendment . . . require[s] a particular description of the things to be seized."  *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)).  "The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant."  *Id.*

The Warrant identifies for seizure, and the Warrant Application sought to demonstrate probable cause to seize, certain sums of "U.S. Currency."  Currency is "something (as coins, treasury notes, and banknotes) that is in circulation as a medium of exchange."  *Merriam-Webster*, CURRENCY.  And in trying to convince Judge Gesner about probable cause, the Warrant Application described in some detail, among other things, "cash [which] was bundled with rubber bands" [Ex. D, Warrant Application

at 3] and "stacks of U.S. Currency [which] were rubber-banded and divided into bundles of varying amounts." [*Id.* at 4]  *Perkins Coie does not have this cash nor does the State of Arizona.*  In fact, none of the "currency" seized by state authorities in 2011 exists, nor did it at the time the 2013 seizure warrant was issued.  As the seizing Arizona Special Agent testified at the evidentiary hearing in the Arizona case, the money was placed into one or more bank accounts of the State of Arizona immediately after seizure.  Where it is now is unknown.  What is known, as described further below, is that the money paid to Perkins Coie, and still to be paid to Perkins Coie, came, or would come, from the Arizona Anti-Racketeering Fund, which consists entirely of monies forfeited to the State following judgments or settlements in racketeering cases.  *See* Ariz. Rev. Stat. § 13-2314.01.

The constitutionally required "particular description" provided in the Warrant by Judge Gesner was of "currency," "dollar bills," it was "not a bank deposit."  [*See* Ex. B, Warrant; *see also* Ex. F, TR of 11/27/2012 at 136:3-137:22 (Special Agent Adelstein confirming that "currency" means tangible "cash" or "dollar bills", not a "bank deposit")]  No such property is, or was ever, held by Perkins Coie nor is it held by the State or elsewhere.[8]

---

[8]    Among the numerous gambits it has deployed and arguments it has raised, the Government has not (yet) argued that the Warrant, though plainly stating it is to seize "currency," actually applies to the Arizona Judgment Funds paid, in part, by official check.  Even if raised, though, the argument fails because Judge Gesner was not given evidence of, and could not have found, probable cause to believe that funds paid from the Arizona treasury in partial satisfaction of judgment are forfeitable *in rem.  Cf. Owens ex rel. Owens v. Lott*, 372 F.3d 267, 273-76 (4th Cir. 2004) (holding that "all persons" warrant fails unless based upon probable cause as to each individual found at particular place to be searched and that proximity to criminal activity or presence at location alone are not sufficient).

II.  **EVEN ASSUMING THAT WHAT THE GOVERNMENT SEEKS IS A RESTRAINING ORDER UNDER § 853(E)(1)(A), MR. BYRD IS ENTITLED TO A HEARING TO ESTABLISH THAT THE FUNDS ARE NECESSARILY AND PROPERLY USED TO RETAIN COUNSEL OF HIS CHOICE.**

If the Court decides that the Warrant is enforceable or if the Court decides that the Government may still seek a restraining order as to the Arizona Judgment Funds, Mr. Byrd then respectfully moves for a hearing where he would further establish that he needs the Arizona Judgment Funds to hire counsel and that those funds are not subject to forfeiture.

In this Circuit, "indicted defendant[s]," who like Mr. Byrd, "seek[] to lift an asset restraint to pay for a lawyer," are entitled to a hearing on this issue. *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001). In *Farmer*, which the Government also cites for this proposition, the Fourth Circuit held that "due process require[d] a hearing for [the defendant] to challenge probable cause," given that the defendant made a threshold showing of the need for the restrained assets to pay his attorneys and the government's agents had conceded that some of the seized assets were legitimate. *Id.* at 804-05. Put differently, the Fourth Circuit has held that a defendant is entitled to a pretrial probable cause hearing if: (1) he demonstrates the need for the restrained assets to retain counsel, and (2) he makes a prima facie showing that the restrained property is not subject to forfeiture.[9] *Id.*; *see id.* at 803 ("[D]ue process requires a pretrial adversary hearing when a defendant claims that a portion of the assets restrained pursuant to criminal forfeiture statutes are untainted and that he has no other funds from which to secure the counsel of his choice." ); *United States v. Marshall*, No. 5:15-CR-36, 2015 WL 4139368, at *5 (N.D. W. Va. July 9, 2015) ("[T]he defendants are entitled to a hearing under *Farmer*, if they can make a 'substantial showing that some of the seized assets may be both legitimate and

---

[9]     As other Circuits have held, a defendant should be entitled to such a hearing merely upon proof that "he or she does not have sufficient alternative assets to fund counsel of choice." *United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013).

necessary to hire an attorney.'"); *see also United States v. Cohen*, No. CR. WDQ-14-0310, 2015 WL 2261661, at *31 (D. Md. May 7, 2015) (describing the second prong as requiring a showing that "there is the risk of an erroneous deprivation of a due process right without a hearing," but construing this requirement as a showing that the assets are non-forfeitable).

Mr. Byrd can make sufficient showings both that (A) he has no assets to pay a lawyer, and (B) that the restrained property is not subject to forfeiture.

### A.      Mr. Byrd Needs the Restrained Assets To Retain Counsel.

Mr. Byrd is financially unable to retain counsel.  As the Government has acknowledged, Mr. Byrd has already been found to qualify for CJA counsel.  Though undersigned counsel has been unable to obtain the CJA-23 Form that Mr. Byrd presumably completed to establish his indigency, this Court previously found him to be indigent.  This is strong evidence that he lacks the funds to hire counsel. *See* 18 U.S.C. § 3006(A) (CJA mandates appointment of counsel to any "financially eligible person"); *United States v. Owen,* 407 F.3d 222, 232 (4th Cir. 2005) ("financially eligible person" determination is of "ability to pay [which] must be evaluated in light of the liquidity of the defendant's assets [and] his personal and familial needs"); *see also Farmer,* 274 F.3d at 806 (holding that hearing was required where "magistrate judge credited Farmer's initial representations [made in support of request for appointed counsel] that the government had seized all of his substantial assets").  Furthermore, although he has attempted to contact friends and family to support his defense, none have been willing or able to do so.[10]  But in any event, Mr. Byrd has tried and failed to assemble other resources for his defense.

---

[10]      Serious constitutional questions exist regarding whether assets of friends and family are even appropriately considered here.

In fact, upon information and belief, when Mr. Byrd contacted a supporter to assist in providing a small amount of money for a consultation with counsel, the Government soon thereafter sent agents to visit the supporter to interrogate her.  Unsurprisingly, she has declined to participate further in these proceedings.

**B.      The Restrained Property Is Not Subject To *In Rem* Forfeiture.**

**1.      There Is No "Substantial Connection" Between The Arizona Judgment Funds And The Crimes Of Which Mr. Byrd Is Accused.**

At a *Farmer* hearing Mr. Byrd would satisfy the second part of the inquiry demanded by that case, namely, demonstrating that Government cannot show a "substantial connection" between the Arizona Judgment Funds and the crimes of which he is accused under § 853.  *United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010).  "Under the 'substantial connection' test, where the government's theory is that the property was used to commit, or facilitate the commission of, the offense of conviction, the government must establish that there was a substantial connection between the property to be forfeited and the offense."  *Id.*  To make this showing, the Government must establish "that the use of the property made the prohibited conduct less difficult or more or less free from obstruction or hinderance."  *Id.* (internal citation and quotation omitted).  The government can make no such showing.

Here, the only property at issue is the Arizona Judgment Funds paid to, or still owed to, Mr. Byrd in satisfaction of the Arizona Judgment and described generally in the October 7 Letter.  More specifically, those funds include:

- $763,898.06 (plus accrued interest) paid to Mr. Byrd from the Arizona state treasury and held in trust for him at Perkins Coie;

- $267,920 (plus accrued interest) held in an unknown bank account by the State of Arizona; and

- $18,000 (plus accrued interest) held in an unknown bank account by the State of Arizona.[11]

[Ex. A, October 7 Letter at 5]  All of the Arizona Judgment Funds were paid, or ordered paid, to Mr. Byrd, from the State of Arizona treasury to satisfy the final judgment he won against the State on behalf of his property.  None of the Arizona Judgment Funds were named in the Warrant or the Second Superseding Indictment.  Instead, those documents refer particularly and exclusively to "currency," which, as described above no longer exists and about which different facts would be relevant to a determination of probable cause.  *See United States v. Morgan,* 224 F.3d 339, 341 (4th Cir. 2000) ("When the defendant has disposed of these assets [subject to forfeiture] or the government cannot locate these assets . . . the court may order substitute property of the defendant forfeited.").  So, at most, the Arizona Judgment Funds are substitute assets.

## 2.    Both Of The Probable Cause Findings Upon Which The Government Relies Are Defective.

Even assuming that the relevant probable cause inquiry now is whether the non-existent currency seized in 2011 and listed in the Second Superseding Indictment and Warrant has a "substantial connection" to criminal activity, it does.

### a.    The Property About Which The Court Found Probable Cause Did Not Exist At The Time Of The Application or Indictment.

As a threshold matter, the probable cause findings that were made in the Warrant and in the Second Superseding Indictment are incorrect or immaterial because the property at issue did not exist. As described in detail above, the "U.S. Currency" that the Warrant Application and Indictment both

---

[11]    To be clear, all references throughout this Response to the Arizona Judgment Funds are to these particular funds only.

ask be seized ceased to exist on or about March 7, 2011. [12]  In addition to rendering performance of the Warrant's and Indictment's commands impossible now, that fact also renders the Warrant's and Indictment's findings of probable cause invalid on the date of its issuance.  At bottom, the Court's probable cause findings were not, as they constitutionally had to be, made with specific regard to existing property at the time of their issuance.

> **b.      The Seizure Warrant Was Based On False Information Claiming That The Arizona Superior Court Did Not Address The Merits Of The Seizure And Did Not Hear Evidence Of Probable Cause (Or The Lack Thereof).**

Even excusing that the probable cause findings were made as to non-existent properties, the findings were also based on false information.

The Warrant Application presented to Judge Gesner was, in key respects, based on false or incomplete information.  Beginning generally and as noted previously, the Warrant Application is founded on the false statement that the Arizona Superior Court did not address "the merits of any seizure or forfeiture [of the currency the Application sought to seize]."  [Ex. B, Warrant Application at 1]

Even if the Court deems evidence of probable cause to seize the currency properly considered here, that precise question was previously the subject of a three-day hearing, at which the Arizona Superior Court heard testimony from the three law enforcement officers responsible for the case and after which it dismissed the case with prejudice.  Ignoring both the fact and substance of the hearing, the Warrant Application largely recites as "facts" allegations which were tested and found wanting at the hearing, as explained below.  Most prominently, the logic of the Application rests on the

---

[12]      Certain property not at issue in these proceedings (chiefly the various vehicles seized and seemingly of nominal and declining value) was and remains, as the parties agree, in Mr. Byrd's custody in Arizona.

unsupported, indeed false, assertion that "Byrd apparently did not have a legitimate source of income during [2010-2013 and therefore] there is probable cause to believe [that the items to be seized are the proceeds of, or facilitated, narcotics activity]."  [Exhibit B, Warrant Application at 9]  We know that isn't true.

The Arizona probable cause hearing adduced evidence of substantial, legitimate income for Mr. Byrd.  Arizona Detective Shallue conceded that he could not deny that Mr. Byrd had legitimate sources of income.  [Ex. F, TR 11/27/2012 at 19:23-20:8]  Detective Shallue's admittedly less-than-detailed investigation uncovered at least *thirteen* legitimate music promotion and entertainment events in which Mr. Byrd was directly involved [*id.* at 28:17-20], but Detective Shallue chose to include only three of those events when claiming that Mr. Byrd had no legitimate income.[13]

Thorough as Detective Shallue may believe his investigation into Mr. Byrd's business and financial dealings was, when confronted at the hearing with an index of more than *138 separate documents* detailing events that Mr. Byrd has promoted and contracts he has entered into with radio stations and celebrities, Detective Shallue admitted that he had not come across a single one of those documents, which date back as far as 2004.  [*Id.* at 81:10-16]  These documents established that Mr. Byrd in fact carried on a legitimate business, and one that deals largely in cash, which justified the presence of large amounts of currency in Mr. Byrd's home.  The State presented no evidence to the contrary, merely its belief based on the "absence" of evidence [Ex. N, TR 11/26/2012 at 34:6-11], and

---

[13]     The omitted events involved stars such as former NBA player Magic Johnson, former NFL quarterback Vince Young, and Grammy-nominated rap superstar Young Jeezy.  Further, among the many logical leaps made by Detective Shallue, and exposed under cross examination, was that one of the reasons he did not believe Mr. Byrd has business relationships with performers like P. Diddy is because when Detective Shallue called P. Diddy—one of the busiest and wealthiest entertainers in the world—his call was not returned.  [Ex. F, TR 11/27/2012 at 18:5-7]

thus there is no probable cause to justify the seizure of that currency.  *See, e.g.*, *$506,231 in U.S. Currency*, 125 F.3d at 452 ("The existence of any sum of money, standing alone, is not enough to establish probable cause to believe the money is forfeitable.)

In addition to hearing evidence as to probable cause, or the lack of it, as to currency seized at Mr. Byrd's home, the Superior Court also considered the question of probable cause as to each item listed in the Warrant and Second Superseding Indictment and possibly relevant here.  Even after hearing that so-called evidence, the Superior Court declined to find probable cause, instead rendering judgment "in favor of Richard C. Byrd as to the Claimed Property [including the $267,920 in U.S. Currency and the $18,000 in U.S. Currency]."  [Ex. I, Final Judgment in 2012 Case at 2–3]

### C.   The Government Is Collaterally Estopped From Arguing That The Property Is Subject To Forfeiture.

Regardless, the Government is collaterally estopped from arguing that either the Arizona Judgment Funds or the properties listed in the Warrant and Second Superseding Indictment are forfeitable *in rem*.  Specifically, the Arizona Court of Appeals decision dismissing the civil forfeiture case with prejudice as a sanction for misconduct precludes the *in rem* forfeiture of the *res* that was before the Arizona Court of Appeals.

"Under 28 U.S.C. § 1738, federal courts must give full faith and credit to state court judgments. This includes the application of state preclusion rules to determine whether a prior state court judgment has [preclusive] effect . . . ."  *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 327 (4th Cir. 2005); *see also In re Genesys Data Technologies, Inc.*, 204 F.3d 124, 128 (4th Cir. 2000) ("[A] federal court must look to state law to determine the preclusive effect of a state court judgment.").  In Arizona, the elements of collateral estoppel are: (1) "the issue sought to be relitigated must be precisely the same as the issue in the previous litigation"; (2) "a final decision on the issue

must have been necessary for the judgment in the prior litigation"; (3) "there must be mutuality of the parties." *State v. Whelan*, 91 P.3d 1011, 1015 (App. 2004) (quoting *State v. Jimenez*, 634 P.2d 950, 952 (1981)) (internal quotation marks omitted).  All three elements are met in this case.

First, the issue sought to be relitigated by the Government here—the *in rem* forfeiture of certain assets—is "precisely the same as the issue in the previous litigation."  *Id.*  The Arizona Court of Appeals dismissed the state's in rem forfeiture of these assets as a sanction for misconduct.

As to the second requirement, Arizona courts have construed it "to mean that '[f]or collateral estoppel to apply . . . a valid and final decision *on the merits* must have been entered.'"  *Whelan*, 91 P.3d at 1015 (quoting *Jimenez*, 634 P.2d at 952) (alternations in original).  In Arizona, it is clear that dismissal with prejudice as a sanction for misconduct is a decision "on the merits."  *See, e.g., Green v. Lisa Frank, Inc.*, 211 P.3d 16, 24 (Ariz. Ct. App. 2009) (judgment of dismissal with prejudice as a sanction for misconduct was an appealable final judgment which "dispose[d] of the cause on its merits, leaving no question open for judicial determination") (internal citation and quotation omitted); *Torres v. Kennecott Copper Corp.*, 488 P.2d 477, 479 (1971) ("[A] dismissal with prejudice is a judgment on the merits.").

Finally, where, as here, the state and federal governments have extensively collaborated in the investigation and prosecution of an action, there is mutuality between the parties.  Collateral estoppel can apply to non-parties "when [they] assume control over litigation in which they have a direct . . . interest then seek to redetermine issues previously resolved."  *Hicks v. Callan*, No. 1 CA-CV 07-0769, 2008 WL 4098979, at *8 (Ariz. Ct. App. Sept. 2, 2008) (quoting *Montana v. United States*, 440 U.S. 147 (1979)) (internal quotation marks omitted) (alterations in original).  Put simply, "[t]he persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be

'strangers to the cause . . .'"  *Id.*  "[O]ne who . . . assists in the prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as he would be if he had been a party to the record."  *Id.*  Here, federal officers and prosecutors were intimately involved in the Arizona litigation and, upon information and belief, the federal government stood to benefit financially if the Arizona litigation resulted in judgment in favor of the State.[14]

So, even if the Government could show a "substantial connection" between the Arizona Judgment Funds and the crimes of which Mr. Byrd is accused, or that such a connection existed between the amounts of "U.S. Currency" listed in the Warrant and the Second Superseding Indictment and the alleged crimes, the Government would still be estopped from arguing that any of the funds were forfeitable *in rem*.  At most, and again, the assets could be considered substitute assets.

### D.    Pre-Trial Seizure Of Substitute Assets Is Impermissible Under Fourth Circuit Law And Prohibited By The U.S. Constitution.

Because, as explained above, the Government cannot show that the property at issue is traceable to an alleged crime (nor should it be able to argue as much), the property is substitute assets. And pre-trial seizure of substitute assets is impermissible under both Fourth Circuit Law and the U.S. Constitution.

"The Fourth Circuit is the only circuit that allows for the pretrial restraint of substitute assets under 21 U.S.C. § 853," even where funds are needed to pay an attorney.  *United States v. Mann*, No. 2:14-CR-14-D, 2015 WL 5970357, at *9 n.6 (E.D.N.C. Oct. 13, 2015); *see In re Billman*, 915 F.2d 916

---

[14]     The process of "Reverse Asset Sharing" is especially common in Arizona because of Arizona's particularly powerful civil asset forfeiture laws.  Assets shared in "reverse" are "cash, property or sales received by a [federal] law enforcement organization [in exchange for the organization's] participation in a forfeiture investigation by [another federal or state agency]."  *See, e.g.*, Dept. of the Treas. *Guidelines for Seized and Forfeited Property,* (2001) available at http://www.treasury.gov/resource-center/terrorist-illicit-finance/Asset-Forfeiture/Documents/redbook.pdf.

(4th Cir. 1990) (holding that substitute assets could be restrained pre-trial, even where they were needed to pay an attorney); *see also United States v. Bollin*, 264 F.3d 391 (4th Cir. 2001) (upholding the restraint of substitute assets in a prosecution under 18 U.S.C. § 853).[15]

But, the Fourth Circuit cases setting forth this rule were decided pre-*Farmer*, which casts doubt on their validity.  Later, in *Farmer*, the Fourth Circuit clearly recognized that defendants "possess[] a qualified Sixth Amendment right to use wholly legitimate funds to hire the attorney of his choice."[16] *Farmer*, 274 F.3d at 804.  Even so, just because the pretrial restraint of assets *may* be authorized in this circuit, it does not mean this court *should* do so in this case.  *See, e.g.*, *United States v. Najjar*, 57 F. Supp.2d 205 (D. Md. 1999) (construing *Billman* as "*authoriz[ing]* the pretrial restraint" of traceable and substitute assets "that can be forfeited after conviction," meaning that the restraint of such assets is not required).  Here, Mr. Byrd has no funds to pay counsel of his choice and has shown no intention to hide or misappropriate any actually tainted assets.  These factors strongly counsel against seizing

---

[15]     *Billman* and *Bollin* rest on an improper reading of the U.S. Supreme Court's decisions in *United States v. Monsanto*, 491 U.S. 600, 614-16 (1989), and *Caplin & Drysdale*, 491 U.S. 617 (1989).  In both *Monsanto* and *Caplin & Drysdale*, the U.S. Supreme Court permitted the pretrial restraint of "forfeitable assets." Subsequently, in *In re Billman*, the Fourth Circuit explained that while "[t]he forfeiture statute does not prevent a defendant who has nonforfeitable assets from retaining any attorney of his choosing," substitute assets "are not nonforfeitable assets." *In re Billman*, 915 F.2d at 922 (quoting *Caplin & Drysdale*, 491 U.S. at 617).  The substitute assets were, as the court explained, subject to forfeiture under § 1963(m), which ultimately permitted the forfeiture of substitute assets.  Thus, the court reasoned, the "government can forfeit a defendant's contraband assets" pretrial "without infringing his Sixth Amendment right to counsel." *Id.*  But, in referring to "forfeitable assets," those cases involved *tainted* assets that had the requisite connection with the crime. *See, e.g.*, *Caplin & Drysdale*, 491 U.S. at 629 ("ill-gotten gains" and "profits of crime" as "forfeitable"; *Monsanto*, 491 U.S. at 602 (assets subject to forfeiture "had been accumulated by respondent as a result of his narcotics trafficking").  No aspect of these decisions counsels that pretrial restraint of *untainted* assets is permissible.

[16]     Regardless, in light of *Billman* and *Bollin*, some courts in this Circuit have held that, even where a *Farmer* hearing has been conducted, substitute assets should be restrained. *See, e.g.*, *United States v. Patel*, 949 F. Supp. 2d 642, 658 (W.D. Va. 2013); *see also, e.g.*, *United States v. Wingerter*, 369 F.Supp.2d 799 (E.D.Va.2005) (holding that "the government may seek pretrial to restrain not only tainted assets, but substitute property as well").  But, these cases ignore that this principle was articulated pre-*Farmer*'s reassertion of the (at a minimum) "qualified Sixth Amendment right to use wholly legitimate funds to hire the attorney of his choice." *Farmer*, 274 F.3d at 804.  These cases also extend the Fourth Circuit's error in reading "forfeitable" assets as authorizing the pretrial seizure of substitute assets.

substitute assets pretrial, assuming such a seizure were permitted.  *See id.* (holding that where there was no evidence the defendants attempted to evade forfeiture of traceable assets, it would be "inappropriate to restrain the untainted portion" of defendant's assets).

Further, even if pretrial restraint of substitute assets is permitted under Fourth Circuit law, it is forbidden by the U.S. Constitution, as other Circuits have held.  Pretrial restraint of untainted assets to retain counsel of choice in a criminal case violates Due Process and the Sixth Amendment.  *See United States v. Ripinski*, 20 F.3d 359, 365 (9th Cir. 1994) (refusing "to extend this drastic remedy to the untainted assets of an individual who is merely accused of a crime, and thus is presumptively innocent"); *United States v. Floyd*, 992 F.2d 498, 502 (5th Cir. 1993) (prejudgment seizure of substitute assets unconstitutional and "hints at writs of assistance")

Not only does the Sixth Amendment provide a right to counsel, "[i]t commands . . . that a particular guarantee of fairness be provided — to wit, that the accused be defended by the counsel he believes to be best."  *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006).  The restraint of untainted assets that are needed to retain counsel threatens this constitutional right.  In fact, the U.S. Supreme Court recently held oral argument in a case presenting precisely this issue.  *Luis v. United States*, ⸺ U.S. ⸺, 135 S.Ct. 2798, ⸺ L.Ed.2d ⸺ (2015) (granting *certiorari*) (Oral Arg. Held Nov. 2, 2015).[17]

---

[17]       While the U.S. Supreme Court has previously addressed the constitutionality of retraining tainted assets that an individual sought to use to pay an attorney, these cases all involved assets that were traceable to crime. *See, e.g.*, *Caplin & Drysdale*, 491 U.S. at 629 (forfeiting "tainted" property and recognizing that the Sixth Amendment's protection "does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of counsel'"); *Monsanto*, 491 U.S. at 616 (same); *Kaley v. United States*, 134 S. Ct. 1090, 1100-05 (2014) (same).  None of the reasoning in these cases suggests that the pretrial restraint of untainted assets would be permissible.  At a minimum, if this Court is inclined to deny Mr. Byrd access to the substitute assets at issue here, he respectfully requests that the Court delay that ruling, and grant a corresponding trial continuance, until the Supreme Court resolves this issue, which is now under its consideration.

## CONCLUSION

The Government seems to ask for many things.  It should receive none of them.  To the extent the Government seeks enforcement of the Warrant, compliance with the warrant is impossible.  Not only is the Warrant invalid, but also it purports to authorize the seizure of property that no longer exists.  Moreover, even assuming that what the Government seeks is a restraining order under 18 U.S.C. § 853(e)(1)(A), Mr. Byrd is entitled to a hearing where he would establish (1) that he cannot afford to pay a lawyer without the Arizona Judgment Funds, and (2) that the Arizona Judgment Funds are not connected to the crimes of which he is accused.  At most the Arizona Judgment Funds are substitute assets, which cannot be constitutionally restrained pre-trial.

Dated:  November 20, 2015

Respectfully submitted,

PERKINS COIE, LLP

By:  /s/  *Jean-Jacques Cabou* (ID# 804205)

    Jean-Jacques Cabou, Bar No. 022835
    Alexis E. Danneman, Bar No. 030478
    JCabou@perkinscoie.com
    ADanneman@perkinscoie.com
    2901 North Central Avenue, Suite 2000
    Phoenix, AZ  85012-2788
    Telephone:  602.351.8000
    Facsimile:  602.648.7000

Attorneys for Defendant RICHARD BYRD

**Appearing in a limited capacity pursuant to prior order of the Court**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was sent via ECF this 20th day of November, 2015 to counsel of record.

_/s/ Alexis Danneman_ \
PERKINS COIE, LLP

128641895