*Exhibit F*

```
         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

                IN AND FOR THE COUNTY OF MARICOPA


  STATE OF ARIZONA,                  )
                                     )
       Plaintiff,                    )
                                     )
  vs.                                ) CV 2012-000121
                                     )
  RICHARD BYRD, aka ROBERT SMITH,    )
  aka DeAndre BYRD, aka, CHRISTOPHER )
  BYRD, STACIE STEWART; SHANTEL      )
  ROSHELL; KIMBERLY REID; LINCOLN    )
  DAVIS; LAURA IRROBALI; NAJAH       )
  STEWART; TEN FINGERS               )
  ENTERTAINMENT; DeAndre BYRD        )
  ENTERTAINMENT; DeAndre BYRD        )
  ENTERTAINMENT,                     )
                                     )
       Defendants *In Personam*,     )
                                     )
  and                                )
                                     )
  THE PROPERTY DESCRIBED IN          )
  Appendix 1,                        )
                                     )
       Defendants *In Rem*.          )
  _____)
```

**BEFORE THE HONORABLE LISA FLORES
SUPERIOR COURT JUDGE**

**EVIDENTIARY HEARING**

Phoenix, Arizona
November 27, 2012

**REPORTED BY:**
AMY E. WEAVER
Certified Reporter
Certificate No. 50462

**PREPARED FOR:**
Attorney at Law
(**Copy**)

```
 1                    A P P E A R A N C E S

 2

 3   For Plaintiff:

 4        Kenneth W. Ravenell, Esq.
          Jean-Jacques Cabou, Esq.
 5        D. Andrew Gaona, Esq.
          Milin Chun, Esq.
 6

 7   For Defendant:

 8        Jeffrey Ryan Borup, Esq.
          Andrea Cummings, Esq.
 9
```

```
 1      A.   No, I called his entertainment company, his
 2   agents.
 3      Q.   Tell me what they said about how it is you would
 4   have him -- would hire him.
 5      A.   Well, I actually asked them to contact him and
 6   have him contact me regarding this case and I never
 7   received any response whatsoever.
 8      Q.   And what did you ask of the person that you spoke
 9   with at his company and what is that company?
10      A.   I'm sorry, I was distracted by someone in the
11   courtroom was laughing.  I'm sorry.
12      Q.   I'm sorry?
13      A.   I'm sorry, what was the question?
14      Q.   I'm sorry, you distract me.
15      A.   I apologize.
16      Q.   What did you ask the person that you spoke with
17   at his company?
18      A.   I asked him how I could get in contact with him
19   or if they had -- they could reach out to him and call me
20   regarding an incident regarding Richard Byrd, DeAndre --
21   D.B. Entertainment and Richard Byrd.
22      Q.   And what is the name of his company?
23      A.   D.B. Entertainment.
24      Q.   No, I'm sorry, I am not being clear.
25      A.   Oh, I don't remember their name.
```

1     Q.   Bad Boy?

2     A.   Bad Boy Entertainment. There is like -- there's
3 three or four that have been associated with him
4 throughout the last few years and I called everybody I
5 could find in an attempt to get through to him. I don't
6 remember who the company was that I actually got through
7 to that said, yeah, we represent him. I asked him, I
8 said, how does one go about employing his services for an
9 event. And that's -- they're the ones who told me well,
10 you would have to submit a price of what you're willing to
11 pay and tell us for how many hours and we would submit it
12 to him. And I don't remember if it was Bad Boy or who it
13 was.

14           Again, there's like, throughout the last few
15 years, I found out that there's been some changes in his
16 management company or whoever his agents were.

17     Q.   And the reason you were reaching out to Sean
18 Combs' company is because you had information that
19 Mr. Byrd, through D.B. Entertainment, had hired him --

20     A.   Yes.

21     Q.   -- for different events?

22     A.   Yes.

23     Q.   Okay. During your testimony yesterday, several
24 times what you have said to this Court was that Mr. Byrd
25 has no legitimate source of income.

```
 1      A.   No.  What I said is I never found any evidence of
 2 a legitimate source of income as far as funds received
 3 from any other -- anything other than what I believe to be
 4 drug sales.
 5      Q.   All right.  So you're not denying that he has a
 6 legitimate source, you're saying that you have not been
 7 able to unearth legitimate source of income?
 8      A.   Correct.
 9      Q.   Okay.
10      A.   I reached out to people who are involved in the
11 business in setting up the P. Diddy event and nobody could
12 tell me that he made anything.
13      Q.   Nobody could tell you?
14      A.   Well, that's --
15      Q.   Or they did not tell you?
16      A.   No.  Their statements were they could not tell me
17 what he may have made because it actually -- one of the
18 individuals, and I believe it was Phil Cardona, that it
19 was an Italian gentlemen that helps sponsor the major
20 event, the P. Diddy event we were referring to is Memorial
21 weekend in Miami.
22           And that individual or Phil Cardona told me
23 that they didn't make any money off the deal and if they
24 didn't make any money, nobody made any money.
25      Q.   Okay.
```

1  Q. Okay.
2  A. 5/28/2010, DeAndre Byrd Entertainment, Phil the
3  Mayor, Memorial Day, Miami, Diddy at the Cameo.
4             THE COURT: When you say "Phil," are you
5  saying "Phil" like P-h-i-l?
6             THE WITNESS: Phil the Mayor.
7             THE COURT: The Mayor, M-a-y-o-r?
8             THE WITNESS: Yes.
9             THE COURT: Phil the Mayor?
10            THE WITNESS: Yes, Your Honor.
11            THE COURT: Okay.
12 BY MR. RAVENELL:
13   Q. Now, from what you learned in your investigation,
14 that is an acronym that this gentleman Phil goes by in the
15 entertainment field as Phil the Mayor?
16   A. Correct.
17   Q. Okay. Now, if I count correctly, those are one,
18 two, three, four, five, six, seven, eight, nine, 10, 11,
19 12 -- 13 events that you became aware of during your
20 investigation.
21            And this was your investigation, I think
22 your report says from February 15th, 2011, up to March
23 18th, 2011.
24            You wrote your affidavit that you submitted
25 to Judge Welty in December of 2011. I note though that

```
 1  premises.
 2              Did you come across that document during
 3  your investigation?
 4      A.   No, sir.
 5      Q.   Let me show you next what is defense 10.
 6      A.   To save some time, we -- I didn't come across any
 7  documents regarding the things you described.
 8      Q.   Thank you.  That's what I asked you earlier if
 9  you did that.
10              So what we have, just to make sure we're
11  clear.  The index that's before you that has 138 documents
12  that we indicated were culled from Mr. Byrd's business
13  records, you did not come across any of these documents
14  during your investigation into Mr. Byrd's legitimate
15  income, correct?
16      A.   I don't believe so, no.
17      Q.   All right.
18              MR. RAVENELL:  Your Honor, that will save us
19  some time without going through all of them.
20              THE COURT:  Okay.  Thank you.
21              MR. RAVENELL:  We aren't going to go through
22  all of them.  We are going to go through some of them.
23  BY MR. RAVENELL:
24      Q.   So the investigation that you did into Mr. Byrd's
25  financial background did not turn up any of these
```

```
 1      Q.   Okay.  Fair enough.
 2                How many times have you participated in a
 3   show cause hearing like the one we're at today?
 4      A.   I can't recall participating in any hearing like
 5   this one.
 6      Q.   Okay.  Have you ever been to a jury trial in a
 7   forfeiture case?
 8      A.   Yes.
 9      Q.   How long ago?
10      A.   Of a jury trial, no, I do not believe it was a
11   jury trial.
12      Q.   Okay.
13      A.   I believe it was just in front of a judge.
14      Q.   Okay.  So no jury trial.
15      A.   I can't definitively say that, but I can't recall
16   one, no.
17      Q.   Okay.  How many times in the hundred or more
18   warrants that you have been involved with have you been
19   asked to do what you were asked to do here?
20                And I will break that down for you.
21                How many times have you been presented with
22   a draft affidavit involving observations and conclusions
23   and allegations by officers other than yourself to
24   determine just based on that affidavit whether probable
25   cause remained for forfeiture of those items?
```

1    A.    No other times that I can recollect.
2    Q.    When did you first hear the name Richard Byrd?
3    A.    I would think it was when I served the seizure
4  warrants in -- earlier in 2011.
5    Q.    The seizure warrant on the banks --
6    A.    On the banks.
7    Q.    -- in 2011?
8          Did you write a report or a supplement or
9  any notes of any kind regarding your involvement in the
10 service of warrants earlier in March of 2011?
11   A.    No reports.  There would be a proof of service
12 document.
13   Q.    Okay.  Is there a proof of service document for
14 the notice of seizure for forfeiture that's Exhibit 12 to
15 this hearing?
16   A.    Yes, there would be a proof of service on those
17 as well.
18   Q.    Where is it?
19   A.    I don't have it.  It would be in the file.
20   Q.    Is that something that you -- do you know if
21 that's something that your office files in court?
22   A.    For notice of seizure for forfeiture, I don't
23 know.  I don't believe so.  For seizure warrant it would
24 be filed in court.
25   Q.    Okay.  You stated earlier that you were asked by

1  conclude that probable cause in your mind existed for the
2  in rem seizure of certain assets?
3      A.   Yes.
4      Q.   Okay.  Where were those assets?
5      A.   Some of them had been constructively seized and
6  some of them were already seized.
7      Q.   Okay.  Let's get back to constructive seizure in
8  a minute but physically where were the assets?
9      A.   Well, the Department of Public Safety had some
10 assets in their possession.  I don't know physically where
11 they all were.
12     Q.   Okay.  Let's start with that.
13          Among the items that were noticed for
14 seizure in Exhibit 12, which you served, I am going -- I
15 am going to ask you to look at page 6 on Exhibit 12.  Do
16 you have that in front of you, sir?
17     A.   Yes.
18     Q.   At the top of page 6 it says $749,080 in U.S.
19 currency seized from 4653 Royal Palm.
20     A.   Yes.
21     Q.   Have you ever been to Royal Palm?
22     A.   No.
23     Q.   And you certainly weren't there on December 1st?
24     A.   No.
25     Q.   And the word "currency," what does that mean to

```
 1  you?
 2      A.   Cash.
 3      Q.   Cash, right?  It is dollar bills?
 4      A.   Right.
 5      Q.   It is not a bank deposit?
 6      A.   That's correct.
 7      Q.   Okay.  Did you see any of Mr. Byrd's currency on
 8  December 1st?
 9      A.   No.
10      Q.   Do you see in the notice of pending forfeiture --
11  I am going to ask you just to keep page 6 handy but to
12  flip back to page 2 for a minute.
13           Go to line 20 where it says, "The property
14  was seized by Steven Adelstein, special agent of the
15  Arizona Attorney General's Office, 1275 West Washington
16  Street, Phoenix, Arizona 85007, on December 1, 2011."
17           Do you see that?
18      A.   Yes.
19      Q.   Is that true?
20      A.   Physically seizing the $749,000?  No.  Retaining
21  possession of either the resulting deposit or the
22  currency, wherever it was, yes.
23      Q.   This isn't wherever it was or the totality of the
24  circumstances, okay, this is an in rem action.  You just
25  testified in rem so you have to have the stuff.  It is the
```

```
 1  stuff that you're proceeding against.
 2              So did you seize $749,080 as depicted in
 3  item 2.1 of Exhibit 12 from 5346 East Royal Palm on
 4  December 1st, 2011?
 5      A.  No.  It had already been seized.
 6      Q.  Okay.  So let's take -- let's take the next one.
 7  Let's take another one.
 8              Item 2.6 is $1,300 in U.S. currency seized
 9  from 5346 East Royal Palm.
10              Would it be correct to assume that you also
11  did not seize that on that day?
12      A.  Right.  It had already been seized.
13      Q.  Right.  You didn't seize any currency --
14      A.  No.
15      Q.  -- on December 1st?
16      A.  Not physically, no.
17      Q.  Well, currency is itself physical, right, it is a
18  dollar bill.  So you didn't seize any currency on December
19  1st, 2011, correct?
20      A.  Yes.
21      Q.  Item 27.7 is $267,920 in U.S. currency from a
22  black rolling suitcase in possession of Mr. Byrd.
23              When did you first meet Mr. Byrd?
24      A.  I don't believe I have ever met Mr. Byrd.
25      Q.  Okay.  So when the notice of pending forfeiture
```

1  says it was seized on December 1st, 2011, in the
2  possession of Mr. Byrd, it was seizing currency, it is
3  false?
4      A.   That was already seized prior to December 1st.
5      Q.   So the statement is false?
6      A.   That I had physically seized it on December 1st?
7  Physically, yes.  It is not -- I did not seize that much
8  of money from anyone on December 1st.  It was previously
9  seized.
10     Q.   Right.  Where is the money?
11     A.   I don't know if it had been converted into a bank
12 account, deposited into a bank account or on file with the
13 Clerk of the Court, or whether it is somewhere else in
14 evidence.  I do not know.
15     Q.   Okay.
16     A.   That's the three options I can think of.
17     Q.   So it is either deposited with the Clerk of the
18 Court in -- not in cash anymore, it is a credit in some
19 electronic account somewhere?
20     A.   Right.
21     Q.   Deposited a bank in some electronic account
22 somewhere?
23     A.   Right.
24     Q.   Or it is in a big box in an evidence warehouse?
25     A.   Yes.

```
 1
 2
 3
 4
 5
 6              I, AMY E. WEAVER, do hereby certify that the
 7  foregoing 207 pages constitute a full, accurate
 8  typewritten record of my stenographic notes taken at said
 9  time and place, all done to the best of my skill and
10  ability.
11
12
13              Dated this 2nd day of November, 2012.
14
15
16              _____
17              Amy E. Weaver
                Certified Reporter
18              RPR # 50462
19
20
21
22
23
24
25
```