# *Exhibit H*

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
Jennie Johnson
12/17/2012 2:41:00 PM
Filing ID 5038680

Jean-Jacques Cabou, Bar No. 022835
JCabou@perkinscoie.com
D. Andrew Gaona, Bar No. 028414
AGaona@perkinscoie.com
**PERKINS COIE** LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
docketPHX@perkinscoie.com

Kenneth W. Ravenell, *(Pro Hac Vice)*
Milin Chun, *(Pro Hac Vice)*
**Murphy, Falcon & Murphy**
One South Street, 23rd Floor
Baltimore, Maryland 21202
Telephone: 410.539.6500
kenneth.ravenell@murphypa.com
milin.chun@murphypa.com

Attorneys for Defendant/Claimant Richard C. Byrd

ARIZONA SUPERIOR COURT

MARICOPA COUNTY

| | |
|---|---|
| STATE OF ARIZONA,<br><br>        Plaintiff,<br><br>        v.<br><br>RICHARD BYRD, aka ROBERT SMITH, aka DEANDRE BYRD, aka, CHRISTOPHER BYRD; STACIE STEWART; SHANTEL ROSHELL; KIMBERLY REID; LINCOLN DAVIS; LAURA IRROBALI; NAJAH STEWART; TEN FINDERS ENTERTAINMENT; DEANDRE BYRD ENTERTAINMENT; DEANDRE BYRD ENTERTAINMENT,<br><br>        Defendants *In Personam*,<br><br>and<br><br>THE PROPERTY DESCRIBED IN APPENDIX ONE,<br><br>        Defendants *In Rem*. | Case No. CV2012-000121<br><br>**CLAIMANT RICHARD C. BYRD'S CLOSING ARGUMENT BRIEF**<br><br>(Assigned to the Hon. Lisa Flores) |

# TABLE OF CONTENTS

Page

Introduction ....................................................................................................... 1

Argument ........................................................................................................... 2

I.     THE STATE'S ALLEGED "RE-SEIZURE" OF MR. BYRD'S
PROPERTY WAS IMPROPER AND NOT PROVIDED FOR BY LAW ............ 4

    A.    The "Seizures" and Subsequent Actions of the State in this Case
Disregarded the Arizona Forfeiture Reform Act........................................... 4

        1.    The State's Elaborate Course of Conduct on December 1,
2011 was an Attempt to Avoid an Adverse Ruling and Avoid
AFRA's Strict Requirements ............................................................. 4

        2.    There was No Release of Property, No Seizure by Agent
Adelstein, and No Seizure by Warrant................................................ 5

        3.    The State's New "Notice of Pending Forfeiture" Was Filled
With Misrepresentations Made to the Claimant and to this
Court ................................................................................................ 7

        4.    The State's Post "Re-Seizure" Seizure Warrant is a Sham
Procured by Misleading Statements from Law Enforcement
Officers and Attorneys ..................................................................... 7

    B.    Each of the State's Errors Requires the Return of Property or
Dismissal of the Verified Complaint............................................................. 8

    C.    A Review of the Proper Application AFRA Highlights the State's
Errors ......................................................................................................... 10

        1.    Step 1: Seizure.................................................................................. 10

                a.    A seizure must be made pursuant to a warrant or by an
officer with firsthand knowledge of facts supporting
probable cause ...................................................................... 10

                b.    A seizure can be "actual" or "constructive."........................ 11

                c.    A seizure can be *in rem* or *in personam*............................... 11

                d.    "Re-seizure" is not prohibited by law, but is limited by
the Arizona Rules of Civil Procedure and principles of
due process ........................................................................... 12

**TABLE OF CONTENTS**
(continued)

Page

e.    An improper seizure deprives the Court of jurisdiction........ 12

2.    Step 2: The Notice of Pending Forfeiture ......................................... 13

3.    Step 3: The Filing of Claims ............................................................. 13

4.    Step 4: The Filing of a Complaint.................................................... 13

5.    Step 5: Jury Trial and Outcome ...................................................... 14

II.    EVEN IF THE COURT CONCLUDES THAT A SEIZURE SOMEHOW
OCCURRED ON DECEMBER 1, 2011, THE STATE FAILED TO
ESTABLISH THE EXISTENCE OF PROBABLE CAUSE FOR THE
SEIZURE OF THE VAST MAJORITY OF MR. BYRD'S PROPERTY ............ 14

A.    The State Failed to Establish Probable Cause for Item 2.1 ($749,080
in U.S. Currency)............................................................................................ 16

1.    The State's Evidence of a "Drug Trafficking Organization" or
"Criminal Syndicate" is Unsupported............................................... 16

2.    The Currency Found in Mr. Byrd's Home "Could Have"
Purchased Many Items, and Could Not Have Been Related to
the Chandler Reversal ...................................................................... 18

3.    The State's Failure to Properly Investigate Mr. Byrd's Line of
Work Does Not Support a Probable Cause Finding ........................ 19

B.    The State Failed to Establish Probable Cause for Item 2.5 ($1300.00
in U.S. Currency)............................................................................................ 21

C.    The State Failed to Establish Probable Cause for Item 2.7
($267,920.00 in U.S. Currency) .................................................................... 22

D.    The State Failed to Establish Probable Cause for Item 2.8
($18,000.00 in U.S. Currency) ..................................................................... 22

E.    The State Failed to Establish Probable Cause for Item 4.1 (2006
White Mercedes). ......................................................................................... 23

F.    The State Failed to Establish Probable Cause for Item 4.2 (2007
Silver Mercedes)........................................................................................... 23

G.    The State Failed to Establish Probable Cause for Item 4.3 (2009
Black BMW). ................................................................................................. 24

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

H.     The State Failed to Establish Probable Cause for Item 4.4 (2010 Can

4

Am Spyder Motorcycle) ................................................................................ 25

5

I.      The State Failed to Establish Probable Cause for Item 4.5 (2008

6

Mercedes CLS 550) ...................................................................................... 25

7

J.      The State Failed to Establish Probable Cause for Item 4.6 (2007

8

Mercedes SL500) .......................................................................................... 26

9

K.     The State Failed to Establish Probable Cause for Item 4.7 (2007

Cadillac Escalade). ....................................................................................... 26

10

Conclusion ..................................................................................................................... 26

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Introduction**

2      Almost two decades ago, the Arizona Supreme Court indicated that it "continue[d]

3 to be enormously troubled by the government's increasing and virtually unchecked use of

4 the civil forfeiture statutes and the disregard for due process that is buried in those

5 statutes." *Wohlstrom v. Buchanan*, 180 Ariz. 389, 394, 884 P.2d 687, 692 (1994).  And as

6 this Court has recognized, the State's power to seize the property of its citizens for

7 forfeiture was, and continues to be, "awesome," such that it must be "exercised very, very

8 carefully and in ***strict compliance*** with statutes."   [Transcript of Evidentiary Hearing,

9 dated 11/27/2012 ("TR 11/27/2012") at 164:14-19 (emphasis added)]  Indeed, the State's

10 exercise of that power is circumscribed by a complex statutory scheme, and more

11 importantly, by fundamental tenets of due process.  The courts are thus the only check on

12 the State's exercise of its "awesome" and oft-abused power to deprive its citizens of their

13 property through the forfeiture process, and this Court is the only check on the State's

14 unlawful and continuous exercise of that power over Mr. Byrd's property.

15      This matter is one of the few non-roadside seizures in Arizona history to come

16 before a court for a probable cause hearing authorized by that statutory scheme.  *See*

17 A.R.S. § 13-4310(B).  At this stage of the proceedings, the State is required to establish

18 the existence of probable cause for its purported seizure of more than $1 million of

19 Mr. Byrd's property.   After three days of testimony and the admission of numerous

20 exhibits, the evidence does not establish that there is (or was) probable cause for the

21 purported seizure of Mr. Byrd's property.[1]  To the contrary, the testimony given by the

22 law enforcement officers involved in that purported seizure reveals a troubling disregard

23 of: (1) the statutory scheme governing civil forfeiture in Arizona; (2) the proper conduct

24 and candor required of attorneys and law enforcement officers in presenting warrants to

25 judges of this Court; and, above all, (3) Mr. Byrd's due process rights guaranteed by the

26

---

27   [1]      As explained further below, we say "purported" seizures because Mr. Byrd
continues to contest all seizures on the grounds that they were improperly executed, if
executed at all and therefore none of his property is properly held by the State for that
28 reason alone.

United States and Arizona Constitutions.  These callous actions should not be condoned by the Court, and accordingly, Mr. Byrd respectfully requests that the Court enter an order: (1) immediately releasing his property from the State's unlawful possession; or (2) dismissing **with prejudice** the State's Verified Complaint against Mr. Byrd and his property for lack of subject matter jurisdiction as a result of the State's failure to effect a proper seizure of the property[2]; or (3) dismissing the State's Verified Complaint against Mr. Byrd and his property **with prejudice** as a sanction for the State's outrageous conduct including, but not limited to, persisting in a course of conduct that was designed to intentionally mislead a judge of this court.

## Argument

Far from establishing probable cause for the seizure of Mr. Byrd's property, the testimony and other evidence presented before the Court during the evidentiary hearing instead set forth a troubling course of conduct by the State in its efforts to retain that property at all costs, including intentionally deceiving a judge of this court.  As Mr. Byrd has exercised his rights to challenge the State's actions along the way, it has become apparent that the State will do and say anything—including before this Court—to attempt to remedy the plethora of mistakes it has made.  This has to stop, and only this Court can put a stop to it.  The sole purpose of this hearing was to require the State to demonstrate probable cause, a task in which the State has miserably failed.  Indeed, the evidence presented to the Court demonstrated that ***no proper seizure of Mr. Byrd's property ever occurred***, a fact that calls the foundations of this civil action into serious question.  Either because of (1) a failure of probable cause, (2) a failure to actually seize property, (3) the State's outrageous conduct, or some combination thereof, Mr. Byrd's property should be immediately released, and the State should not be afforded a third opportunity to proceed against it.

---

[2]  Although Mr. Byrd's motion to dismiss is fully briefed and has been taken under advisement by the Court, subject matter jurisdiction is an issue that can be raised "at any time."  *Kelly v. Kelly*, 24 Ariz. App. 582, 583, 540 P.2d 201, 202 (1975).

This brief addresses questions directly raised by the Court, and explains several reasons why Mr. Byrd's property must be returned forthwith.   Chiefly, Mr. Byrd is entitled to the immediate, actual return of his property because:

1.   The State's alleged "re-seizure" of Mr. Byrd's property on December 1, 2011 was not a seizure at all, but rather a tortured, unprecedented procedural scheme—which included misleading a sitting judge of this Court—intended to avoid both an adverse ruling in the previous civil forfeiture action and the strict requirements of the Arizona Forfeiture Reform Act ("AFRA").  Under these circumstances, the *res* was not properly brought before the Court, a fact which deprives this Court of subject matter jurisdiction.

2.   A cursory review of AFRA clearly demonstrates the litany of errors made by the State in its hasty attempt to "re-seize" Mr. Byrd's property on December 1, 2011.  The State's failure to strictly follow these procedures means Mr. Byrd's property must be released.

3.   Alternatively, the "release" of all of Mr. Byrd's property by the State on December 1, 2011 is still in effect, and the actual release of property that should have occurred then must occur now.   [*See* Notice of Release, 12/1/2011, CV2011-005949; TR 11/27/2012 at 158-60]

4.   Finally, assuming that a "re-seizure," without prior judicial approval, in fact occurred on December 1, 2011, the State's presentation of evidence failed to establish probable cause for the *in rem* forfeiture of any of the property to which Mr. Byrd has made a claim.[3]   As a result, that property must immediately be released.

---

[3]   Although Mr. Byrd believes that the State made serious errors with respect to its purported "re-seizure" of his property, for purposes of this evidentiary hearing, he is willing to concede, based on the testimony thus far, the existence of probable cause for the seizure of Items 4.8, 6.9, and 6.11 as identified in Appendix 1 to the Verified Complaint. He does so, however, without prejudice to challenge the ultimate forfeitability of this property or to challenge later any fact relating to it.

1    I.    **THE STATE'S ALLEGED "RE-SEIZURE" OF MR. BYRD'S PROPERTY**
2          **WAS IMPROPER AND NOT PROVIDED FOR BY LAW.**

3          A.    **The "Seizures" and Subsequent Actions of the State in this Case**
                 **Disregarded the Arizona Forfeiture Reform Act.**

4                This case is founded on the alleged *in rem* "re-seizure" that the State contends took

5    place on December 1, 2011.[4]   Testimony during the hearing makes clear that the State

6    failed to comply with the statutory requirements for such a seizure in numerous ways.

7                      1.    **The State's Elaborate Course of Conduct on December 1, 2011**
                            **was an Attempt to Avoid an Adverse Ruling and Avoid AFRA's**
8                           **Strict Requirements.**

9                First, the incredible timeline of events relating to the "release" and alleged "re-

10   seizure" of Mr. Byrd's property bears repeating:

11        •     On December 1, 2011, on the eve of a hearing before Judge Anderson on

12              Mr. Byrd's then-pending Motion to Dismiss, the State filed a Notice of

13              Voluntary Dismissal of its previous verified complaint against Mr. Byrd and

14              his property in CV2011-005949.

15        •     That same day, the State filed a "Notice of Release of Property"[5] stemming

16              from the Voluntary Dismissal.

17   _____

18          [4]    Although the State's position on whether this alleged re-seizure was *in rem*
     or *in personam* has often been incoherent, it has finally conceded that Agent Adelstein's
19   purported "re-seizure" on December 1, 2011—if it occurred at all—was *in rem*. [*See*
     Transcript of Evidentiary Hearing, dated 9/20/2012 ("TR 9/20/2012") at 19:12-16
20   (Mr. Borup stated that Agent Adelstein had probable cause for an *in rem* seizure); TR
     11/27/2012 at 135:21-136:3 (Agent Adelstein testified that he only evaluated the case for
21   probable cause for an *in rem* seizure); *id.* at 111:10-13 (Ms. Cummings avows that the
     seizure was based on Agent Adelstein's evaluation of probable cause)]

22          [5]    Agent Adelstein testified that the property was never actually released. [TR
     11/27/2012 at 150:25-151:4 (Agent Adelstein testifies that between March 2011 and the
23   present the items have always been seized and were never released)]  There can be no
     argument that this filing by the State was a sham, in that the State deceived Judge
24   Anderson when Mr, Borup and the State declared in open court that the property was
     released and re-seized.
25          Despite the suspicious circumstances under which the Notice was filed, and as
     described above, Mr. Byrd alternatively contends that the legal effect of that Notice must
26   be upheld.  The property must be deemed to have been legally released and because, as we
     argue and the facts support, it has never been "re-seized," either by Agent Adelstein on
27   December 1, 2011 or through Judge Welty's seizure warrant (which was never executed),
     all of the property must be returned to Mr. Byrd to effectuate the State's Notice of Release
28   of Property.

                                        -4-                        No. CV2012-000121

1        •     Also that same (very busy) day, the State filed a **new** Notice of Seizure for

2              the same property named in the Notice of Release.  The new Notice of

3              Seizure [Exhibit 12[6]], listed Agent Adelstein as the seizing officer.[7]

4        •     The following day, in Judge Anderson's courtroom, undersigned counsel

5              learned of these events for the first time.

6        •     Then, on December 16, 2011, Mr. Byrd filed his Application for Order to

7              Show Cause requesting that the Court determine whether there was probable

8              cause for the alleged "re-seizure."

9        •     Seeking to avoid the hearing, the State decided, on December 19, 2011, to

10             ask Judge Welty for a seizure warrant: (1) covering property it already had

11             in its possession [TR 9/20/2012 at 119:24-120:4]; (2) that it never executed

12             [*id.* at 121:19-25; TR 11/27/2012 at 152:4-5]; and (3) that was never

13             actually returned [TR 9/20/2012 at 123:20-22].

14

15           **2.     There was No Release of Property, No Seizure by Agent Adelstein, and No Seizure by Warrant.**

16        Despite filing a "Notice of Release of Property," in CV2011-005949, there is

17 simply no dispute that no such release ever occurred as it should have.[8]  As Agent

18 Adelstein starkly admitted on cross-examination, whatever assets the State sought to seize

19 were, to his understanding, in the possession of the Department of Public Safety—and not

---

20      [6]     Unless otherwise noted, citations to an "Exhibit" refer to the exhibits

21 entered into evidence during the evidentiary hearing held on September 20, and November 26-27, 2012.

22      [7]     As discussed below, during the evidentiary hearing, we learned that in a desperate attempt to avoid certain defeat on the motion to dismiss the State's complaint in

23 CV2011-005949, Mr. Borup commandeered Agent Adelstein and required him to immediately review a draft affidavit in support of a seizure warrant to determine if that

24 affidavit supported a finding of probable cause.  Mr. Borup advised Agent Adelstein that if he, an employee of the Attorney General's Office, did not find probable cause, the

25 office would lose the ability for good to re-seize and forfeit any of Mr. Byrd's property. This is not only shocking, but smacks of conflict of interest as well, especially given the

26 financial benefit that the Attorney General's Office receives from forfeited property.

27      [8]     As discussed in n.7, *supra*, it is Mr. Byrd's alternative position that the Notice of Release must be given effect through the immediate release of all of his

28 property.

1    Mr. Byrd—when the "re-seizure" allegedly took place on December 1, 2011.  [TR
2    11/27/2012 at 136:9-11]   No property left the State's possession and control, and no
3    property was actually returned to Mr. Byrd.  Thus, when Agent Adelstein allegedly "re-
4    seized" the property on December 1, 2011, he did so without a warrant, and without a
5    *single shred* of firsthand knowledge of any facts that would give rise to a probable cause
6    determination.  Instead, he was required by the Attorney General's Office—specifically,
7    Mr. Borup—to drop everything he was doing and review a draft affidavit (in other words
8    an unsworn, unsigned, narrative) prepared by Detectives Kleinman and Shallue "to
9    determine if there was probable cause to retain some assets" belonging to Mr. Byrd.  [*id.*
10   at 107:2-11]  Agent Adelstein understood that there was a "particular time sensitivity" to
11   reviewing that affidavit and making a probable cause determination because of "[t]he
12   concern that that the assets would be returned without [the] ability to reseize them in the
13   future."  [*Id.* at 130:5-22]   Determining probable cause in this fashion was foreign to
14   Agent Adelstein, as he testified that he could not remember another instance when he had
15   "been presented with a draft affidavit involving observations and conclusions and
16   allegations by officers other than [himself] to determine just based on that affidavit
17   whether probable cause remained for forfeiture of those items."  [*Id.* at 128:21-129:1]

18        Despite the State's attempt to characterize Agent Adelstein's actions on
19   December 1, 2011 as a "re-seizure" of Mr. Byrd's property, there was no seizure—actual
20   or constructive—of any of Mr. Byrd's property on that date.  The *only* step Agent
21   Adelstein took in furtherance of any purported "seizure" was serving Mr. Byrd's counsel
22   and the Department of Public Safety with a Notice of Pending Forfeiture *the following*
23   *day, December 2, 2011*.  [TR 11/27/2012 at 120-21]  He readily admitted to the fact that
24   he did nothing more to physically or constructively seize *any* of the items listed in the
25   Notice of Pending Forfeiture, and that he did not know if any previous steps had ever been
26   taken to constructively seize any of those items.  [*Id.* at 138-48]  This admission makes
27   perfect sense; Agent Adelstein had never been to Mr. Byrd's residence on Royal Palm [*id.*
28   at 136:18-24], he never saw any of the currency that he allegedly "re-seized" [*id.* at 137:7-

9], had never physically seen any of the automobiles he allegedly "re-seized" [*id.* at 145:4-8], and never even met Mr. Byrd [*id.* at 138:23-24]. In fact, his only previous involvement in the State's investigation of Mr. Byrd was serving several banks with seizure warrants in March 2011. [*Id.* at 106:18-22] Under these circumstances, it is impossible for Agent Adelstein to have actually seized any of Mr. Byrd's property, or to have taken any of the steps necessary to constructively seize it. Accordingly, the State's alleged "re-seizure" of that property, and the retention thereof for well over a year, was procedurally deficient and made in bad faith.

### 3. The State's New "Notice of Pending Forfeiture" Was Filled With Misrepresentations Made to the Claimant and to this Court.

Because Agent Adelstein admitted that he did not actually or constructively seize any of Mr. Byrd's property on December 1, 2011, he had no choice but to admit that the statements indicating that a seizure had occurred contained in the Notice of Pending Forfeiture are simply false. [*Id.* at 138:25-139:9] This is a disturbing example of a misrepresentation made to Mr. Byrd and the other potential claimants in this matter, but more importantly, was a misrepresentation made to this Court that should not be tolerated. As explained further below, the NOPF is the documentary foundation on which an *in rem* forfeiture action rests. A forfeiture action based on a deficient NOPF must fail.

### 4. The State's Post "Re-Seizure" Seizure Warrant is a Sham Procured by Misleading Statements from Law Enforcement Officers and Attorneys.

AFRA plainly does not contemplate or authorize the State's decision in the instant case to seek a seizure warrant nearly three weeks ***after*** the property at issue had already been seized, "released" by the dismissal of the previous verified complaint against it and a notice of release of property, and then purportedly "re-seized" by a law enforcement officer with no firsthand knowledge of any facts supporting probable cause. A *post hoc* warrant is a nullity, *cf. State v. Hicks*, 146 Ariz. 533, 535, 707 P.2d 331, 333 (Ct. App. 1985) (holding that "[p]olice officers cannot launder their prior unconstitutional behavior by presenting the fruits of it to a magistrate"), a principle which rings especially true

when, as here, such a warrant is obtained as part of a ruse engineered by the State to avoid an adversarial testing of its evidence in a probable cause hearing specifically authorized by A.R.S. § 13-4310(B).

The lack of efficacy of the seizure warrant obtained on December 19, 2011 is further highlighted by the fact that the warrant was ***never executed or returned*** [TR 9/20/2012 at 123:20-22; *id.* at 121:19-25; TR 11/27/2012 at 152:4-5], and was thus nothing more than a sham intended to subvert AFRA's strict requirements.[9]  Equally disturbing is the fact that the State and its agents did not see fit to inform Judge Welty, who ultimately signed the warrant, that Mr. Byrd had filed an Application for Order to Show Cause that was then pending before Judge Anderson, that the property at issue was already in the State's possession and no seizure would actually take place, and that the entire seizure warrant was a *post hoc* attempt to justify a purported seizure that occurred nearly three weeks prior.  [TR 9/20/2012 at 120:5-12][10]

## B.   Each of the State's Errors Requires the Return of Property or Dismissal of the Verified Complaint.

Either individually or collectively, these substantive and procedural errors by the State in its attempt to effect a "re-seizure" of Mr. Byrd's property mean only one thing: the State has held Mr. Byrd's property for more than one year without having made a proper seizure of that property, and for nearly two years since the initial seizure in March

---

[9]     This Court has already recognized that the lack of a return violated the very terms of the seizure warrant itself, which called for a return within 15 days "describing the property seized and including the seizing agency's estimate of the total fair market liquidation value of the property."  [TR 11/27/2012 at 170:4-7]

[10]     Indeed even the State's story about what was said to Judge Welty and by whom has changed many times, as each prior version was proven false.  First, the State implied that one of its lawyers, Barton Fears, told Judge Welty orally about the bizarre facts at hand.   [TR 9/20/2012 at 17; *id.* at 26:16-20]   This Court expressed that to "possibly not to have told Judge Welty" about the prior proceedings was "very troubling." [*Id.* at 23]  Mr. Borup then claimed that the prior history was "included in the application" for the seizure warrant.  [*Id.* at 24:3-12]  But that too proved to be totally false.  Finally, Mr. Fears then testified he was not present before Judge Welty—proving false yet another of Mr. Borup's hastily invented stories.  [Deposition Transcript of Barton Fears, dated 11/9/2012 at 26]  Ultimately, this Court's preliminary conclusion that Judge Welty was not "given the full information" [TR 9/20/2012 at 28:24-29:1] was proven correct.

1    2011.  Putting aside for a brief moment the very serious concerns about the State's lack of

2    candor with the Court and its willful disregard of the requirements imposed by AFRA—

3    which, in and of themselves, would justify dismissal with prejudice as a sanction[11]—its

4    failure to properly seize Mr. Byrd's property deprives this Court of subject matter

5    jurisdiction over the property and requires that the Court order the State to return it.  *See*

6    *State ex rel. Horne v. Rivas*, 226 Ariz. 567, 572 ¶ 19, 250 P.3d 1196, 1201 (Ct. App.

7    2011) (finding that release of property to a claimant was proper where the State did not

8    actually or constructively seize the relevant property, ***and thus "did not effectively take***

9    ***the Property at all***.") (emphasis added); *Matter of 1976 Porsche*, 141 Ariz. 421, 424, 687

10   P.2d 946, 949 (Ct. App. 1984) (holding that a forfeiture proceeding is void when the

11   "seizing authority has disregarded the statutory requirements for forfeiture"); *see also*

12   *Republic Nat'l Bank of Miami v. United State*s, 506 U.S. 80, 84 (1992) ("[A] valid seizure

13   of the res is a prerequisite to the *initiation* of an *in rem* civil forfeiture proceeding.").

14   Because the State has already failed in its two previous attempts to seize and forfeit

15   Mr. Byrd's property, it should not receive a third opportunity, especially where the State's

16   second "seizure" was made in bad faith as a means to end-run around this Court's

17   authority to determine probable cause.  As a result of this fundamental failure to establish

18

19   _____

20   [11]      As this Court has already recognized [TR 9/20/2012 at 17:21-23], there is
     little doubt that the presentation of the December 19, 2011 seizure warrant to Judge Welty
21   was misleading.  Neither the application nor the affidavit in support of the warrant
     informed Judge Welty that: (1) the property which the warrant sought to seize was already
22   in the possession of the State; (2) that the property would not actually be "seized"; (3) that
     the warrant was a *post hoc* attempt to obtain a probable cause finding for a purported "re-
23   seizure" that had already occurred; and (4) that just three days prior, Mr. Byrd had filed an
     Application for Order to Show Cause related to that alleged "re-seizure."  The State has
24   claimed that it did not hide the ball because of a single line in the application which states
     that the property "was previously seized," and that the case was later dismissed with
25   prejudice.  [*Id.* at 26]  It goes without saying that this bare statement gives an incomplete
     and misleading account of facts that were known to the State, its law enforcement officers,
26   and its attorneys.  Under these circumstances, the Court should invoke its inherent
     authority, and dismiss this action as a sanction against the State for this unrepentant
27   violation of, among other things, its duty of candor to the tribunal.  *See Hmielewski v.*
     *Maricopa Cnty.*, 192 Ariz. 1, 4 ¶ 14, 960 P.2d 47, 50 (Ct. App. 1997) (holding that trial
28   courts have authority under Rule 11, the disciplinary rules, and their inherent authority to
     sanction "bad faith conduct during litigation").

even that a "seizure" ever actually occurred—and probable cause aside[12]—this Court should release the property, or dismiss the verified complaint with prejudice for lack of subject matter jurisdiction.

## C.    A Review of the Proper Application AFRA Highlights the State's Errors.

With an understanding of how the State handled its alleged "re-seizure" of Mr. Byrd's property, it is helpful next to consider how that process was supposed to go.  A comparison of the two clearly demonstrates the substantive and procedural errors that have colored this entire proceeding.

### 1.    Step 1: Seizure.

#### a.    A seizure must be made pursuant to a warrant or by an officer with firsthand knowledge of facts supporting probable cause.

Pursuant to AFRA, a seizure for forfeiture begins with an actual seizure of nonexempt property under several circumstances, most notably upon issuance of a seizure warrant, or when a "peace officer has probable cause to believe that the property is subject to forfeiture."   A.R.S. § 13-4305(A)(3)(c).   Thus, a seizure can occur only after the issuance of a seizure warrant, or by a law enforcement officer who is a ***percipient witness*** to facts that would establish probable cause. *Cf. State v. Moody*, 114 Ariz. 365, 366, 560 P.2d 1272, 1273 (Ct. App. 1977) (explaining that the "key" to a proper search warrant "is the ***personal knowledge*** of the affiant as to the facts alleged") (emphasis added).   If property is seized pursuant to a seizure warrant, AFRA does not provide for a hearing to test the probable cause for the seizure.[13]   If property is seized without a previously-

_____

[12]    Although A.R.S. § 13-4310(B) requires the Court to determine whether probable cause for the seizure now exists, that statute presupposes that an officer seizure actually occurred.

[13]    Although not at issue in the evidentiary hearing, Mr. Byrd contends that the inability to request a probable cause hearing in the case of a seizure by warrant is unconstitutional. *See, e.g.*, *United States v. James Daniel Good Property*, 510 U.S. 43, 52-53 (1993) (holding that the Due Process Clause requires pre-deprivation notice and a hearing absent "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event") (quotation marks and citation omitted); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("[T]he central meaning of

1  obtained warrant, the seizure is subject to adversarial testing in a probable cause hearing.

2  A.R.S. § 13-4310(B).

3  **b.  A seizure can be "actual" or "constructive."**

4  Under AFRA, law enforcement officers can seize property in one of two ways:

5  actually or constructively.[14]  An actual seizure is precisely that—an officer taking physical

6  control of a piece of property (*e.g.*, money, an automobile, a painting, or a necklace that is

7  carried away to an impound lot or evidence lockup).  A constructive seizure, however,

8  may be made ***only*** by "posting notice of seizure for forfeiture on the property or by filing

9  notice of seizure for forfeiture or notice of pending forfeiture in any appropriate ***public***

10 ***record relating to the property***."  A.R.S. § 13-4305(B) (emphasis added).  The "public

11 record" contemplated by section 13-4305(B) is one that would give a bona fide purchaser

12 notice of the pendency of some action against that piece of property (*e.g.*, filing a lien

13 with the Motor Vehicle Division, a *lis pendens* with a County Recorder's office, or a

14 UCC-type statement with the Secretary of State's Office).

15 **c.  A seizure can be *in rem* or *in personam*.**

16 Property that can be seized for forfeiture as described above may be seized either *in*

17 *rem* (as the fruits or instrumentalities of specified criminal conduct) or *in personam* (as

18 substitute assets from a person alleged to have been involved in specified criminal

19 conduct).  Importantly, because probable cause for an *in personam* seizure requires a

20 finding that property should be seized from a specific person, rather than a finding that an

21 item of property is the fruit or an instrument of crime, an *in personam* seizure can only be

22 authorized by a judge.  A.R.S. § 13-4305(D).  A peace officer is never authorized to make

23 a warrantless *in personam* seizure.  *Id.*

24 procedural due process [is that] . . . Parties whose rights are to be affected are entitled to
   be heard; and in order that they may enjoy that right they must first be notified.")

25 (quotation marks and citation omitted).

26     [14]   There is no authority, at all, for the State's suggestion that there is a third
27 category called "legal seizure."  [*See* TR 11/27/2012 at 155:21-157:2]  Indeed, when
   asked about this legal fiction created by the State for purposes of this evidentiary hearing,
   Agent Adelstein testified that he had never heard that term.  [*Id.* at 156:25-157:2]  And
28 with good reason—it does not exist.

1

**d.    "Re-seizure" is not prohibited by law, but is limited by the Arizona Rules of Civil Procedure and principles of due process.**

2

3    As Arizona law currently stands, the State's ability to "re-seize" property that was

4    once seized and subsequently released is not prohibited, subject to a seven-year statute of

5    limitations. A.R.S. § 13-4308(B); *see also In re Approximately $50,000 in U.S. Currency*,

6    196 Ariz. 626, 630 ¶ 11, 2 P.3d 1271, 1275 (Ct. App. 2000) ("[O]ur legislature has

7    apparently determined that the state should be afforded up to seven years to commence

8    forfeiture proceedings."). Any "re-seizure" by the State must comply with each of

9    AFRA's requirements for a proper seizure (either actual or constructive), and must also

10    conform with the Arizona Rules of Civil Procedure. A.R.S. § 13-4310(E)(1). This

11    means, for example, that a "re-seizure" could not occur if the State again attempts to

12    voluntarily dismiss the civil forfeiture action under Rule 41(a), because the State would be

13    procedurally precluded from filing a third complaint under those circumstances. *See* Ariz.

14    R. Civ. P. 41(a). Finally, like any seizure, a "re-seizure" is constitutionally limited by the

15    Due Process Clause.

16

**e.    An improper seizure deprives the Court of jurisdiction.**

17    The seizure procedures set forth above are not mere suggestions; rather, they are

18    ***mandatory and jurisdictional***. If a seizure is not properly effected under Arizona law, the

19    Court has no jurisdiction to conduct an *in rem* civil forfeiture proceeding, and the property

20    must be immediately released. *See State v. One Single Family Residence at 1810 East*

21    *Second Ave.*, 193 Ariz. 1, 4, 969 P.2d 166, 169 (Ct. App. 1997) (holding that the court

22    lacks jurisdiction if the *res* is not "brought before the court through proper seizure");

23    *Matter of 1976 Porsche*, 141 Ariz. at 424, 687 P.2d at 949 ("Since Arizona has aligned

24    itself with those jurisdictions which authorize forfeiture proceedings only where the *res* is

25    properly brought before the court, we also follow the cases which void the proceeding

26    when the seizing authority has disregarded the statutory requirements for forfeiture.")

27    (emphasis added); *cf. Rivas*, 226 Ariz. at 572 ¶ 19, 250 P.3d at 1201 (finding that ***release***

28    ***of property to a claimant was proper where the State failed to follow the service***

1 **procedures set forth in the forfeiture statutes, and thus did not actually or constructively**

2 **seize the relevant property**, and that the claimant's "failure to file a claim or seek further

3 court action was reasonable because the State did not effectively take the Property at all").

4                          **2.      Step 2: The Notice of Pending Forfeiture.**

5         Once property is ***properly seized*** under the procedures set forth above, the State is

6 required to provide owners or those with apparent interests in the property with a notice of

7 pending forfeiture ("NOPF").  A.R.S. §§ 13-4307, 13-4311(A).[15]  The NOPF gives notice

8 of the date of seizure, the seizing officer, and the legal basis for the seizure, including

9 whether the property was seized *in rem* or *in personam*.  It provides general notice to *in*

10 *personam* defendants, and further gives potential claimants of *in rem* assets notice of the

11 need to file a claim to assert standing to defend against the seizure.  *See* A.R.S. § 13-

12 4311(D).

13                          **3.      Step 3: The Filing of Claims.**

14         When property has been seized *in rem*,[16] "[a]n owner of or interest holder in the

15 property may file a claim against the property, within thirty days after the notice, for a

16 hearing to adjudicate the validity of his claimed interest in the property."  A.R.S. § 13-

17 4311(D).  Such a claim must include a host of information, including the nature of the

18 claimant's interest in the property, and the relief sought.  *Id.* § 13-4311(E).  This claim

19 notifies the State as to who will defend the forfeiture and why, and is intended to reduce

20 fraudulent or invalid defenses to that seizure.

21                          **4.      Step 4: The Filing of a Complaint.**

22         After seizure and service of owners and known interest holders with a NOPF, the

23 State must formally institute a civil action against the property and/or the owner by filing

24         [15]      Importantly, the mere service of an NOPF itself does cannot act as a
25 "seizure" under Arizona law.  *See* A.R.S. § 13-4305(B) (explaining specific means by
which property can be constructively seized, service of an NOPF not among them).

26         [16]      Because an *in personam* forfeiture action is, by definition, an action against
27 a person, rather than against a piece of property, no claim should be required in such a
case.  This issue, though, has never been litigated and it is therefore the practice of
28 undersigned counsel to file a claim even as to *in personam* seizures in order to avoid any
argument that the Defendant lacks standing.

1   a complaint.  At this point, the parties are equally situated and are like any other civil

2   litigants.  The Arizona Rules of Civil Procedure apply, and the parties are free to engage

3   in discovery and file motions as permitted thereunder (*e.g.*, a motion to dismiss).  *See*

4   A.R.S. § 13-4310(E)(1).

5                       **5.      Step 5: Jury Trial and Outcome.**

6          Finally, if the matter does not otherwise settle, the State's complaint seeking the

7   forfeiture of property proceeds to a jury trial (if requested) and ends in a verdict and

8   judgment in favor of one party.  To succeed in an *in rem* proceeding like that here, the

9   State must show that each seized asset is, itself, a fruit or instrumentality of a specified

10  criminal act.  It is not sufficient for the State to prove that the property merely belongs to a

11  person that the State has determined to be "bad."

12
13  **II.    EVEN IF THE COURT CONCLUDES THAT A SEIZURE SOMEHOW
        OCCURRED ON DECEMBER 1, 2011, THE STATE FAILED TO
        ESTABLISH THE EXISTENCE OF PROBABLE CAUSE FOR THE
14      SEIZURE OF THE VAST MAJORITY OF MR. BYRD'S PROPERTY.**

15         If the Court concludes that a seizure in fact occurred on December 1, 2011, despite

16  all the evidence to the contrary, Mr. Byrd is nonetheless entitled to the prompt return of

17  his property.  The evidentiary hearing held by this Court required the State to establish the

18  existence of probable cause for the *in rem*[17] seizure of property to which Mr. Byrd made a

19  claim under the procedures set forth in A.R.S. § 13-4311(D).  That property, as set forth

20  and numbered in Appendix 1 to the Verified Complaint, is as follows:

| Item No. | Property Description |
|----------|----------------------|
| 2.1 | $749,080.00 in U.S. currency seized from 5346 E. Royal Palm Rd., Paradise Valley, AZ 85253-2528 |
| 2.5 | $1,300.00 in U.S. currency seized from 5346 E. Royal Palm Rd., Paradise Valley, AZ (white envelope on the northwest wall) |
| 2.7 | $267,920.00 in U.S. currency seized from a black rolling suitcase in the possession of Byrd, Richard. |

---

[17]     Again, the State has conceded that all property allegedly seized was seized *in rem*.  *See* n.4, *supra*.

| Item No. | Property Description |
|---|---|
| 2.8 | $18,000.00 in U.S. currency seized from the 2002 Chevrolet Suburban, VIN 1GNEC16ZX2J306541, AZ Plate No. ANK4399 |
| 4.1 | 2006 White Mercedes, AZ License Plate #AJR8574, VIN: 4JGCB75E16A016484 |
| 4.2 | 2007 Silver Mercedes, AZ License Plate #AMC7192, VIN: WDDNG71X17A044685 |
| 4.3 | 2009 Black BMW, AZ Temp. License Plate #0N00644, VIN: WBAKB83539CY58273 |
| 4.4 | 2010 Can AM Spyder Motorcycle, AZ License Plate#62L6MC, VIN: 2BXJADA16AV000230 |
| 4.5 | 2008 Mercedes CLS 550, CA License Plate #6NWK853, VIN: Unknown |
| 4.6 | 2007 Mercedes SL500, CA License Plate #6MTF429, VIN: WDDNG71X47A032840 |
| 4.7 | 2007 Cadillac Escalade, License Plate : Unknown, VIN: 1GYEC638X7R260987 |
| 4.8 | 2002 Chevrolet Suburban, AZ Plate No. ANK4399, VIN 1GNEC16ZX2J306541 |
| 6.9 | 1 Black rolling suitcase in the possession of Byrd, Richard |
| 6.11 | The keys for the 2002 Chevrolet Suburban, VIN 1GNEC16ZX2J306541, AZ Plate No. ANK4399 |

Because the State has conceded that Agent Adelstein's alleged "re-seizure" of Mr. Byrd's property on December 1, 2011 was *in rem*, *see* n.4, *supra*, the State carried the burden to establish that each of the items listed above was the fruit or instrumentality of qualifying criminal activity, such that its seizure for forfeiture was supported by probable cause.[18] What the State cannot do, however, is simply set forth a litany of alleged "bad

---

[18]     During the hearing, counsel for the State avowed that items 4.1, 4.3, and 4.7 were not in the State's possession [TR 9/20/2012 at 18:6-16], and the State presented no evidence that it ever properly carried out an actual or constructive seizure of those vehicles.

behavior" by Mr. Byrd and rely on that list to support the *in rem* seizure of whatever pieces of Mr. Byrd's property it desires.  But this is precisely the strategy chosen by the State, thus requiring the immediate return of Mr. Byrd's property.

### A.    The State Failed to Establish Probable Cause for Item 2.1 ($749,080 in U.S. Currency).

Item 2.1 is $749,080 in U.S. currency that was in Mr. Byrd's residence on March 7, 2011 when a search warrant on the residence was executed.  That currency was found in two suitcases in a "female closet right off the master bedroom."   [Transcript of Evidentiary Hearing, dated 11/26/2012 ("TR 11/26/2012") at 32:9-14]  That closet also apparently contained "hundreds of thousands of dollars of female clothing."  [*Id.*]  Both suitcases were locked, and the currency inside was found in freezer bags.  [*Id.* at 32:17-24]  Importantly, it was not located anywhere near any narcotics or other contraband, nor were any narcotics or contraband found anywhere in the residence.

In their testimony, Detectives Kleinman and Shallue justified the seizure of this money—and in fact, the seizure of all of the property at issue here—based on three closely related ***suppositions***: (1) based on other evidence, Mr. Byrd was part of a drug trafficking organization or criminal syndicate involved in the sale of drugs; (2) the currency found in Mr. Byrd's home could have been used to purchase large amounts of marijuana; and (3) officers could not confirm that Mr. Byrd had a "legitimate" source of income that would justify the possession of such a large amount of currency.

### 1.    The State's Evidence of a "Drug Trafficking Organization" or "Criminal Syndicate" is Unsupported.

In investigating Mr. Byrd long before his February 2011 arrest, the State quickly came to the conclusion that Mr. Byrd and others were involved in a "drug trafficking organization" or "criminal syndicate" without ever once seeing Mr. Byrd possessing illegal narcotics.  As best we can tell from the inconsistent testimony of Detectives Kleinman and Shallue, law enforcement formulated a belief that Mr. Byrd was involved in purchasing marijuana and shipping it to the East Coast for resale.  [*See, e.g.*, TR

9/20/2012 at 134:6-9 (Detective Kleinman references Mr. Byrd shipping parcels to the East Coast); TR 11/26/2012 142:6-9 (Detective Shallue acknowledges that he believes that Mr. Byrd was selling marijuana on the East Coast)]  That belief, however, is based on a series of law enforcement theories and conclusions that simply did not bear scrutiny during the hearing.  Although the examples are many, two stand out as particularly egregious.

*First*, in conducting trash runs on Mr. Byrd's residence during the course of its investigation, the State found a crumpled up piece of paper that it has characterized definitively under oath in a search warrant affidavit and before this Court as a "drug ledger."  [TR 9/20/2012 at 132:12-23; *see also* Exhibit 3]  Both Detectives Kleinman and Shallue tried to stand by their belief that Exhibit 3 is a drug ledger, but when pressed, Detective Shallue admitted that at least two of the entries—which their affidavit [Exhibit 1] characterized as drug sales or purchases involving an individual named "Kent"—actually referred to "rent."  [TR 11/26/2012 at 82-83][19]

*Second*, paragraph 2 of Exhibit 1 indicates that Detectives Kleinman and Shallue believed that Mr. Byrd and others were "responsible for transportation of ***cocaine*** to other states for purposes of sale."  [TR 9/20/2012 at 129:6-9 (emphasis added)]  Detective Kleinman's explanation of this theory was simply confounding:

> A      We do have small packages that he has sent to locations on the east coast that are not typically associated with marijuana -- smaller boxes, smaller weights.  From that, you know, I can assume that there's a good chance there's cocaine in it.  ***Can I* --**
>
> Q      Wait a minute --
>
> A      ***prove it? You know, did we seize the packages?  No, we did not***, but...

---

[19]      The Court should know that when shown an actual copy of Exhibit 3, the alleged "drug ledger," in a recent interview with counsel in the parallel criminal proceeding against Mr. Byrd, Detective Kleinman did not recognize the document as the document he had twice under oath characterized as a "drug ledger," and without hesitation, stated that he would ***never*** testify under oath that the document was a "drug ledger" without further information.

No. CV2012-000121

1   [*Id.* at 130:4-11 (emphasis added)]   In other words, because Detective Kleinman found

2   FedEx receipts for small packages he never saw or seized, he testified, and swore under

3   oath to Judge Welty in his affidavit, that those packages contained cocaine.  Ridiculous.

4   This reckless statement—and many others like it—made both in Exhibit 1 and to this

5   Court in testimony do not support a finding of probable cause.

### 2.   The Currency Found in Mr. Byrd's Home "Could Have" Purchased Many Items, and Could Not Have Been Related to the Chandler Reversal.

8        Next, and as the Court indicated when speaking with counsel about what each

9   party's closing argument brief should discuss [TR 11/27/2012 at 172:14-19], the currency

10  seized from Mr. Byrd's residence could have purchased many things.  The State would

11  have this Court believe that the amount of cash seized directly correlates to the remaining

12  marijuana Mr. Byrd supposedly agreed to purchase.  But that isn't true; simple arithmetic

13  reveals that the cash in his home, seized almost a month after his arrest, had nothing to do

14  with the Chandler Reversal.

15       During his testimony, Detective Shallue told the Court that in Arizona, a pound of

16  marijuana normally sells for approximately $500 per pound.  [TR 11/26/2012 at 38:23-

17  39:1]  During the Chandler Reversal, Mr. Byrd allegedly arrived at a warehouse with

18  $267,920, which was intended for the purchase of 500 pounds of marijuana.  This comes

19  to approximately $535 per pound.  There is no dispute that during the Chandler Reversal,

20  no separate price terms were discussed for the additional 2200 pounds that Mr. Byrd

21  allegedly desired to purchase.

22       According to the State [TR 11/27/2012 at 172:20-25], the $749,080 found in

23  Mr. Byrd's residence (Item 2.1) was earmarked by Mr. Byrd for purposes of purchasing

24  the remaining 2200 pounds of marijuana.  But that simply makes no sense; dividing 2200

25  pounds into that amount of money yields a per pound price of $340.  This represents a

26  ***36% discount*** from the price that Mr. Byrd had supposedly paid before, when no such

27  discount was ever negotiated or even discussed.  The State's theory that this money was

28  intended to complete the Chandler Reversal transaction thus rings hollow.

1

### 3.   The State's Failure to Properly Investigate Mr. Byrd's Line of Work Does Not Support a Probable Cause Finding.

2

3      At its heart, the State's theory that Mr. Byrd's property is all subject to forfeiture is

4   based on its apparent conclusion that Mr. Byrd has no "legitimate" source of income.  The

5   State's position is that because Mr. Byrd does not have a "conventional business" with an

6   office [TR 11/27/2012 at 60], and that Mr. Byrd's family, friends, and associates are

7   hesitant to speak with law enforcement agencies currently prosecuting him [*id.* at 65:12-

8   21], the large amounts of currency found in his home must be related to drug trafficking.

9   But that simply is not true, nor is that theory supported by evidence that would rise to the

10   level of probable cause.

11      It is important, however, to recognize what the State is actually saying.  When

12   pressed on cross-examination, Detective Shallue admitted that he could not deny that

13   Mr. Byrd has a legitimate source of income; instead, he merely could not "unearth" a

14   legitimate source of income.  [*Id.* at 19:23-20:8]  Detective Shallue's less-than-detailed

15   investigation uncovered at least ***thirteen*** legitimate events in which Mr. Byrd was directly

16   involved [*id.* at 28:17-20], but Detective Shallue chose to include only three of those

17   events when preparing the affidavit that was presented to Judge Welty on December 19,

18   2011.[20]  [Exhibit 1][21]

19      As part of his investigation into Mr. Byrd's finances, Detective Shallue spoke with

20   Phil "The Mayor" Cardona, a Miami-area club promoter, and indicated that from that

21   conversation, he learned that Mr. Byrd had not made any money from one large event that

22   he included in his affidavit.  [Exhibit 1]  In reviewing the transcript of the phone call with

23   Mr. Cardona, Detective Shallue had no choice but to acknowledge that when specifically

24

---

25   [20]      In a similarly slanted conclusion, Detective Shallue testified that one of the reasons he did not believe Mr. Byrd has business relationships with performers like

26   P. Diddy is because when Detective Shallue called P. Diddy—one of the busiest and wealthiest entertainers in the world—his call was not returned.  [TR 11/27/2012 at 18:5-7]

27   [21]      The omitted events involved stars such as former NBA player Magic Johnson, former NFL quarterback Vince Young, and Grammy-nominated rap superstar

28   Young Jeezy.

asked if Mr. Byrd took a loss on the event, Mr. Cardona responded with: "That, I don't know."   [TR 11/27/2012 at 38:11-14; *see also* Exhibit 5]   The conversation with Mr. Cardona continued, and included a discussion of a Super Bowl event which Mr. Byrd was involved with organizing.  Mr. Cardona again indicated to Detective Shallue that he could not speak to whether Mr. Byrd made or lost money because "that was more or less them."  [TR 11/27/2012 at 46:12-24; *see also* Exhibit 5]  Throughout the conversation, Mr. Cardona made two things clear:  Mr. Byrd has a professional relationship with and books P. Diddy and other well-known artists, and he is not in a position to know whether Mr. Byrd makes money on his events or not.

Detective Shallue also communicated with the attorney for another Miami-area club promoter who could not provide any information about what Mr. Byrd made on a particular event.   [TR 11/27/2012 at 48:6-15]   After reviewing this part of the investigation on cross-examination, Detective Shallue made a telling admission:

> Q.     And you would agree that not being able to verify how much Mr. Byrd made, whether he made money is not proof that he has no legitimate income, correct?
>
> A.     Correct.

[*Id.* at 49:5-8] Precisely.[22]

---

[22]     Detective Shallue also testified that he could not confirm that Mr. Byrd had legitimate income because he saw a picture of one of the events in which Mr. Byrd had some involvement that "looked like it had less than maybe 50, 60 people there." [TR 11/27/2012 at 29:17-21]  Putting aside that one photograph from an event does not demonstrate the full spectrum of attendees, the Court can rest assured that Mr. Byrd's events are well-attended.  Indeed, pictures from a September 29, 2012 event co-sponsored by Mr. Byrd under DB Entertainment at a club called "Compound" in Atlanta, Georgia (at which popular entertainers P. Diddy, Chris Brown, Young Jeezy, Fat Joe, Wiz Khalifa, and others made appearances), from the same website Detective Shallue found as part of his investigation, clearly demonstrate a large crowd noted online as surpassing 6,000 attendees with the price for admission reaching $10,000 a table. [*See* INDMIX.com, AG ent     and     DB     ent     Saturdays     @     Compound     9-29-12, http://www.indmix.com/album12/092912e/index.html (last visited Dec. 14, 2012), excerpt attached hereto as Exhibit A]  This is only one example of many such events promoted by Mr. Byrd under DB Entertainment that have been featured on this website.  This fact highlights the incomplete nature of Detective Shallue's investigation into Mr. Byrd's business ventures, and is further proof that his statements about Mr. Byrd's lack of "legitimate" income should be disregarded.

1   Thorough as Detective Shallue may believe his investigation into Mr. Byrd's
2   business and financial dealings was, when confronted of an index of more than ***138***
3   ***separate documents*** detailing events that Mr. Byrd has promoted and contracts he has
4   entered into with radio stations and celebrities, Detective Shallue admitted that he had not
5   come across a single one of those documents, which date back as far as 2004.  [*Id.* at
6   81:10-16]  The existence of these documents demonstrate now that Mr. Byrd in fact
7   carries on a legitimate business, and one that deals largely in cash, that would justify the
8   presence of large amounts of currency in Mr. Byrd's home.  The State presented no
9   evidence to the contrary, merely its belief based on the "absence" of evidence [TR
10  11/26/2012 at 34:6-11], and thus there is no probable cause to justify the seizure of that
11  currency.

12  Finally, it is impossible for there to have been an *in rem* seizure of this currency on
13  December 1, 2011 because the currency itself is no longer in the State's possession, as
14  Agent Adelstein testified.  Instead, it was deposited into a bank account maintained by
15  DPS, and thus has been comingled with a host of other monies.  There is (and was) no
16  probable cause for seizure because the *res*—the seized currency—no longer exists.

17
18  **B.**  **The State Failed to Establish Probable Cause for Item 2.5 ($1300.00 in U.S. Currency).**

19  Item 2.5 is $1,300.00 in U.S. currency that was seized from the bedroom of
20  Mr. Byrd's residence.  Detective Shallue's testimony—the only State's evidence offered
21  specific to this currency—merely established that the currency was found in the bedroom
22  in some proximity to Item 2.1, discussed *supra*.  [TR 11/26/2012 at 39:11-23]  Consistent
23  with the State's unsupported theory about Mr. Byrd's lack of "legitimate" income,
24  Detective Shallue further noted that he could not "substantiate that Mr. Byrd nor [sic]
25  Ms. Stewart or anybody residing at the house had made that money legitimately."  [*Id.*]

26  The State's guesses as to where Item 2.5 came from are emphatically ***not*** probable
27  cause that would subject that property to seizure for forfeiture *in rem*.  The State failed in
28  its meager attempt to connect this envelope of currency to any criminal activity.

-21-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.    The State Failed to Establish Probable Cause for Item 2.7 ($267,920.00 in U.S. Currency).**

Item 2.7 is $267,920.00 in U.S. currency that Mr. Byrd allegedly brought with him to the Chandler Reversal to purchase 500 pounds of marijuana.  [TR 11/26/2012 at 40:5-8]  It is impossible, however, for there to have been an *in rem* seizure of this currency on December 1, 2011 because the currency itself is no longer in the State's possession, as Agent Adelstein testified.  Instead, it was deposited into a bank account maintained by DPS, and thus has been comingled with a host of other monies.  That is, even if there once was probable cause to seize this currency incident to Mr. Byrd's arrest as part of the Chandler Reversal, there is probable cause no longer because the *res*—the seized "dirty money"—no longer exists.

**D.    The State Failed to Establish Probable Cause for Item 2.8 ($18,000.00 in U.S. Currency).**

Item 2.8 is $18,000.00 in U.S. currency that was found in the "glove box or console" of the 2002 Chevrolet Suburban that Mr. Byrd allegedly drove to the Chandler Reversal.  [TR 11/26/2012 at 40:9-13]   This currency is entirely distinct from that identified by Detective Shallue as being brought to the Chandler Reversal for the purpose of purchasing marijuana.  [*Id.* at 40:5-8]

Because Item 2.8 was not linked by any testimony or other evidence to the drug transaction at the heart of the Chandler Reversal, the State did not establish probable cause for the *in rem* seizure of that currency.  It was in a separate portion of the vehicle, and was not offered as any form of payment for the narcotics that were to be purchased.  It could have been used for anything, and without further evidence, has not been demonstrated to be the fruit or instrumentality of any crime.  As a result, it should be released into Mr. Byrd's custody.

**E.    The State Failed to Establish Probable Cause for Item 4.1 (2006 White Mercedes).[23]**

Item 4.1 is a 2006 Mercedes that was purchased from Statewide Auto in California under the name "Robert Smith."  [TR 11/26/2012 at 40:23-25]  The only evidence offered by the State specific to Item 4.1 was the testimony of Detective Kleinman, who merely testified that the vehicle was purchased from Statewide Auto and was registered to Robert Smith [TR 9/20/2012 at 62:8-63:1], and that of Detective Shallue, who testified that this vehicle was used by Mr. Byrd on the day that he "confronted Detective Kleinman,"[24] and that it was also observed on surveillance driving in a manner that Detective Shallue believed, without more, was "inten[ded] to detect law enforcement."  [TR 11/26/2012 at 40:23-41:13]

The testimony of Detectives Kleinman and Shallue simply fails to establish that Item 4.1 is a fruit or instrumentality of any criminal behavior.  The fact that Mr. Byrd apparently drove the vehicle on occasion does not connect it to *any* criminal activity.  The State presented no evidence that the vehicle was ever used in any criminal transaction, or that it was purchased with the proceeds of any such transaction.  As a result, it failed to establish probable cause for the seizure thereof.

**F.    The State Failed to Establish Probable Cause for Item 4.2 (2007 Silver Mercedes).**

Item 4.2 is a 2007 Mercedes that was also purchased from Statewide Auto in California.  [*Id*. at 41:18-22]  It was registered to Shantell Roshell, who told law enforcement officers that she purchased the vehicle as a "favor" to a man she believed to

---

[23]    As set forth above, the State has avowed to the Court that it does not have this item in its possession.  Because Mr. Byrd has no means to independently verify this avowal, he has chosen to discuss the lack of probable cause for the seizure thereof in case the State's representation is inaccurate.

[24]    As the Court will recall from the testimony of Detective Shallue, this "confrontation" occurred when Mr. Byrd approached Detective Kleinman's unmarked vehicle inquiring as to whether Detective Kleinman was there to "kidnap a child."  [TR 11/27/2012 at 9:19-23]  In response, Detective Kleinman told Mr. Byrd that it was "none of [his] fucking business" and told Mr. Byrd to "get the fuck out of [there]."  [*Id.*]

be named Robert Smith  [*Id.* at 42:10-18]  The only evidence specific to Item 4.2 offered by the State was the testimony of Detective Shallue, who stated that it was driven on several occasions by Stacie Stewart "in a like manner of the white Mercedes" [*id.* at 41:24-25], and further that the vehicle was used by Ms. Stewart to transport unspecified "evidence" to a storage facility [*id.* at 42:3-5].

Like Item 4.1, the State failed to present any evidence that would support a finding of probable cause to seize Item 4.2 *in rem*.  It failed to connect that particular vehicle to any particular criminal act, or to trace its purchase to proceeds from any criminal act.  At best, the State has raised questions as to how the vehicle was titled, but that alone is insufficient to justify the seizure and retention of the vehicle for forfeiture.

### G.    The State Failed to Establish Probable Cause for Item 4.3 (2009 Black BMW).[25]

Item 4.3 is a 2009 BMW that was purchased in Arizona, and was registered to Shantell Roshell.  [TR 11/26/2012 at 43:8-10]  The State's only evidence specific to the seizure of this vehicle was the fact that Detective Shallue "believe[s]" that the purchase documents were "falsified" because Ms. Roshell told him that she actually bought the car for Robert Smith.  [*Id.* at 43:10-16]

Again, the State failed to present any evidence that would support a finding of probable cause to seize Item 4.3 *in rem*.  Detective Shallue's testimony did not connect that particular vehicle with any particular criminal act, and did not even attempt to trace its purchase to the proceeds of any criminal act.  The State has merely (and again) only raised questions as to how the vehicle was titled, but that is insufficient to justify the seizure and retention of the vehicle for forfeiture.

---

[25]    As set forth above, the State has avowed to the Court that it does not have this item in its possession.  Because Mr. Byrd has no means to independently verify this avowal, he has chosen to discuss the lack of probable cause for the seizure thereof in case the State's representation is inaccurate.

**H.    The State Failed to Establish Probable Cause for Item 4.4 (2010 Can Am Spyder Motorcycle).**

Item 4.4 is a 2010 Can Am Spyder Motorcycle that was purchased by a woman named Laura Irrobali from Ride Now Powersports in Goodyear, Arizona.  [*Id.* at 43:17-44:3]  Once again, the only evidence presented specific to this vehicle was the testimony of Detective Shallue, who related the fact that Detective Kleinman had interviewed the "manager or owner" of Ride Now Motorsports, who said that Ms. Irrobali came into the store with a "large black male," and that it was "clear to him that the vehicle was not for her."  [*Id.* at 44:1-13]  According to Detective Shallue, just prior to the purchase of this vehicle, there were deposits made into Ms. Irrobali's bank account from Baltimore, Georgia, and "[m]aybe Ohio," and those funds were used to purchase the vehicle.  [*Id.* at 44:14-23]  Additionally, Detective Shallue testified that Mr. Byrd was seen driving this vehicle after he was released from jail in March 2011.  [*Id.* at 45:3-8]

Although Detective Shallue may have questions about how the purchase of Item 4.4 was funded, his testimony failed to establish probable cause for its *in rem* seizure.  He offered no proof that the vehicle was used in any crime, and made no attempt to connect the money used to purchase it (wherever it happened to come from) to the proceeds of any crime.  As a result, there is no probable cause that would justify the seizure of this vehicle.

**I.    The State Failed to Establish Probable Cause for Item 4.5 (2008 Mercedes CLS 550).**

Item 4.5 is a 2008 Mercedes CLS 550 that was purchased from Statewide Auto in California and registered to Robert Smith.  [*Id.* at 45:9-14]  The State's only evidence specific to this vehicle was the very vague testimony of Detective Shallue, who could not distinguish between this vehicle and the 2007 Mercedes SL500 that represents Item 4.6.  [*Id.* at 45:10-11]  According to Detective Shallue, one of these two vehicles was located near the condominium of Najah Stewart—the mother of one of Mr. Byrd's children—after Mr. Byrd's arrest on March 7, 2011.  [*Id.* at 46:6-11]

1   Detective Shallue's testimony could not even distinguish this vehicle from another
2   vehicle that was seized from Mr. Byrd, to say nothing of providing any facts that would
3   support a finding of probable cause for its *in rem* seizure for forfeiture.   There is no
4   probable cause that would justify the seizure of this vehicle for forfeiture.

5
6   **J.   The State Failed to Establish Probable Cause for Item 4.6 (2007 Mercedes SL500).**

7   Item 4.6 is a 2007 Mercedes SL500 550 that was purchased from Statewide Auto
8   in California and registered to Robert Smith.   [*Id.* at 45:10-14]   As set forth above,
9   Detective Shallue could not distinguish between this vehicle and the 2008 Mercedes
10  CLS500 that represents Item 4.5.   For the same reasons set forth above, there is no
11  probable cause that would justify the seizure of this vehicle for forfeiture.

12
13  **K.   The State Failed to Establish Probable Cause for Item 4.7 (2007 Cadillac Escalade).[26]**

14  According to the Notice of Pending Forfeiture and the State's Verified Complaint,
15  Item 4.7 is a 2007 Cadillac Escalade.   The State's evidence specific to this vehicle,
16  however, is limited only to Detective Shallue's testimony that it was registered to Robert
17  Smith.  [*Id.* at 46:20-22]   As with all of the preceding seized vehicles, the State offered no
18  proof that the vehicle was used in any crime, and made no attempt to connect the money
19  used to purchase it to the proceeds of any crime.   Accordingly, there is no probable cause
20  to support the *in rem* seizure of this vehicle.

21  **Conclusion**

22  Based on the foregoing, this Court lacks jurisdiction to continue to entertain the
23  State's attempt to cause the forfeiture of Mr. Byrd's property because of the State's failure
24  to properly bring that property before the Court, and therefore by law the property must be
25  returned to Mr. Byrd.   The State's misleading of a judge of the superior court to effect this

26  _____

27  [26]    As set forth above, the State has avowed to the Court that it does not have this item in its possession.  Because Mr. Byrd has no means to independently verify this avowal, he has chosen to discuss the lack of probable cause for the seizure thereof in case
28  the State's representation is inaccurate.

1    so-called "re-seizure" is sanctionable, and the appropriate sanction is the return of all of

2    Mr. Byrd's property and the dismissal of the State's Verified Complaint with prejudice.

3    Even if the purported "re-seizure" of Mr. Byrd's property was legally sufficient, the State

4    failed to establish probable cause for that "re-seizure," its only task in the lengthy hearing

5    held before this Court.  In either case, Mr. Byrd's property must be promptly released, and

6    the Verified Complaint against it and Mr. Byrd should be dismissed with prejudice for the

7    reasons discussed in the pending Motion to Dismiss, as supplemented herein.

8    Dated:  December 17, 2012              **PERKINS COIE** LLP

9

10                                          By: *s/ Jean-Jacques Cabou*
                                               Jean-Jacques Cabou, Bar No. 022835
11                                             JCabou@perkinscoie.com
                                               D. Andrew Gaona, Bar No. 028414
12                                             AGaona@perkinscoie.com
                                           2901 North Central Avenue, Suite 2000
13                                         Phoenix, Arizona 85012-2788
                                           Telephone:  602.351.8000
14                                         Facsimile:  602.648.7000

15                                         _____
                                           Kenneth W. Ravenell *(Pro Hac Vice)*
16                                         Milin Chun *(Pro Hac Vice)*
                                           Murphy, Falcon & Murphy
17                                         One South Street, 23rd Floor
                                           Baltimore, Maryland 21202
18                                         Telephone:  410.539.6500
                                           kenneth.ravenell@murphypa.com
19                                         milin.chun@murphypa.com

20                                         Attorneys for Defendant Richard C. Byrd

21   ORIGINAL of the foregoing e-filed and a
     COPY mailed this 17th day of December, 2012,
22   to:

23
     Jeffrey R. Borup, Esq.
24   Financial Remedies Section
     Office of the Attorney General
25   1275 W. Washington Street
     Phoenix, AZ 85007
26   *Attorney for the State*

27
     /s/ Pamela R. Drew
28   25372584.3

# Exhibit A

Case 1:14-cr-00186-RDB    Document 252-8    Filed 11/20/15    Page 34 of 38





AG ent and DB ent Saturdays @ Compound 9-29-12

Page | **1** | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |



The line was madness!!!!

Case 1:14-cr-00186-RDB   Document 252-8   Filed 11/20/15   Page 35 of 38



Chris Brown walked in!!!

Case 1:14-cr-00186-RDB   Document 252-8   Filed 11/20/15   Page 36 of 38



Jeezy walkined in!!!

Case 1:14-cr-00186-RDB   Document 252-8   Filed 11/20/15   Page 37 of 38



Diddy Walked In!!!!

Case 1:14-cr-00186-RDB   Document 252-8   Filed 11/20/15   Page 38 of 38



Fat Joe Walked !!!!