**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. RDB-14-0186** |
| **v.** | : | |
| | : | |
| **RICHARD BYRD,** | : | |
| | : | |
| **Defendant.** | : | |
| | ....o0o... | |

**GOVERNMENT'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND FOR OTHER RELIEF**

Now comes the United States of America, by and through undersigned counsel, and hereby submits the following Memorandum of Law in opposition to the defendant's motions to suppress evidence and for other relief (Dkts. 165, 301-312), and states as follows:

**PRELIMINARY STATEMENT**

Defendant Richard Byrd stands charged in a Second Superseding Indictment with conspiracy to distribute and possess with the intent to distribute large quantities of cocaine and marijuana, in violation of 21 U.S.C. § 846, and with conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). Through counsel, the defendant has filed several motions seeking suppression of various statements and physical evidence, and motions for other relief. Each motion will be addressed separately herein.

**FACTUAL BACKGROUND**

The Second Superseding Indictment sets forth perhaps the best summary of the evidence against Byrd, and includes the methodologies used by conspirators as they acquired, distributed, and financially benefitted from the sale of hundreds of kilograms of cocaine and many tons of marijuana.

During the course of the conspiracies charged here, Byrd was the head of an organization that obtained large quantities of cocaine and marijuana from sources of supply in Arizona, Texas, and California, and sold those drugs in Maryland, Ohio, Georgia and elsewhere for the financial gain of members of the conspiracy.  Byrd's organization used freight companies to ship drugs to distribution points in Baltimore, Maryland and other areas.

Members of the organization collected the proceeds of drug sales from the organization's customers, generating large quantities of cash.  That cash was frequently transported and stored in bulk quantities and often used (at least in part) to pay for additional supplies of drugs.  The organization employed couriers to transport large quantities of cash throughout the country.  The organization also engaged in financial transactions and other activities – including using various banks and businesses – designed to launder the monetary proceeds from the organization's drug sales.

Members of the organization also sought to conceal their identities from law enforcement.  As a part of that, they would keep false identifications to provide to law enforcement or others, use false and fictitious names and identities to open bank accounts through which drug proceeds were laundered, or give false names to contract for goods and services.  They also used multiple disposable and pre-paid cellular telephones and frequently changed phones and phone numbers in an attempt to avoid law enforcement scrutiny.

During the course of the investigation, which spanned several years, law enforcement conducted a number of searches and seized various pieces of evidence which are relevant to Mr. Byrd and his associates.  Mr. Byrd has moved to suppress (in motions at docket numbers 165, 301-310) various evidence obtained and statements made during a number of encounters with law enforcement.  He also seeks the disclosure of confidential informants and for notice of any

2

404(b) or 609 evidence.  (Dkts. 311-12.)

## ANALYSIS

As discussed further below, Mr. Byrd's motions are all either moot or should be denied.

**I.     Several aspects of Mr. Byrd's motions are moot because the Government does not intend to use the evidence Mr. Byrd seeks to suppress.**

The United States does not intend to use the following evidence in its case-in-chief:

- Statements made by Byrd on March 1, 2010, when he was a passenger in a vehicle stopped by police in Los Angeles, California (Dkt. 165);

- Evidence obtained on April, 12, 2011 from Byrd during the execution of a search warrant at 9500 Sidebrook Road, Owings Mills, Maryland, the residence of his sister (Dkt. 165);

- Statements made by Byrd on September 6, 2013, when he was a passenger in a vehicle stopped by police in Frederick County, Maryland (Dkt. 165, 303); and

- Evidence obtained and statements made during the October 26, 2009 stop of Byrd in Los Angeles (Dkt. 307).[1]

As a result, the aspects of Byrd's motions addressing those stops/seizures (i.e., Dkt. 165 (in part); Dkt. 303 (entirely)) are moot.

---

[1]     Although the Government does not intend to present evidence seized during this incident or any testimony of the law enforcement officers involved in this stop, the Government does intend to present evidence about this incident in the form of documents seized during the subsequent searches and statements made by Byrd to others about this incident.

II.     **The Search of 5346 East Royal Palm, Scottsdale, on March 7, 2011 pursuant to a search warrant was legal and the evidence obtained is admissible.**

Mr. Byrd has also filed a motion to suppress the evidence seized on March 7, 2011, pursuant to a search of 5346 East Royal Palm, Scottsdale, Arizona.  (Dkt. 165, 310.)

A.      **Facts**

On March 6, 2011, Maricopa County (AZ) Superior Court Judge Monica S. Garfinkel issued a search warrant for several locations and vehicles, including 5346 East Royal Palm, Paradise Valley, Arizona.  (A copy of that warrant and supporting materials is attached hereto as Exhibit 1.)  The affidavit submitted in support of that warrant outlined the information gathered as a part of the investigation.  (Exh. 1 at 9 (of 38).)

There, the affiant (Detective Kleinman) outlined numerous large cash deposits by Stacie Stewart in the years prior to 2011.  (*Id.* at 9-10.)  He also explained the prior rental of a luxury house in Arizona (4550 N. 62nd Place) that appeared to be Stewart using another name, Andrea King.  (*Id.* at 10-11.)  Det. Kleinman also described prior surveillance at a location used by Stewart and efforts to follow people leaving that location (including Stewart) that were thwarted by apparent counter-surveillance.  (*Id.* at 11-13.)  One of the vehicles seen leaving the N. 62nd Place location – a silver Chevy Tahoe – was later tracked to a shipping business, where it had dropped off large boxes that were ultimately searched and found to contain 150 pounds of marijuana.  (*Id.* at 13-14.)  A search warrant executed on the 4550 N. 62nd Place location ultimately recovered 300 additional pounds of marijuana, an assault rifle, body armor vests, a handgun, and almost $20,000.  (*Id.* at 14.)  Detective Kleinman explained that the silver Tahoe was found to be a rental car that had been rented to Lincoln DAVIS, whose name was also on the APS account for 5346 East Royal Palm.  (*Id.*)  Detective Kleinman also detailed how – after they

had identified moving trucks at the N. 62nd Place location – Byrd approached him and questioned his presence in the area while he was conducting surveillance at that location.  (*Id.* at 15-16.)

The affiant further explained that the rental trucks – after making significant efforts to lose law enforcement – were then followed to 5346 East Royal Palm, where the car Byrd had been in was also seen.  (*Id.* at 16.)   Detective Kleinman also detailed the rental/utilities information on 5346 East Royal Palm and how those connections related to Stewart.  (*Id.* at 17.) Detective Kleinman also detailed the investigation into the 5346 East Royal Palm location, including FedEx records and towing records related to Byrd and Stewart.  (*Id.* at 19-21.) Kleinman also detailed surveillance conducted at that location of Stewart and others.  (*Id.* at 25-26.)  And he explained the financial investigation into "funnel accounts" to move large quantities of cash that appeared to be used by the Byrd organization.  (*Id.* at 26-30.)  Detective Kleinman also explained that Byrd had been arrested in Chandler, Arizona in February 2011 attempting to purchase 2,700 pounds of marijuana.  (*Id.* at 32-33.)  Detective Kleinman also explained, based on his knowledge and experience, the types of things likely to be kept at 5346 East Royal Palm, including U.S. currency and records of financial transactions.  (*Id.* at 36-37.)

On March 7, 2011, Arizona police executed the search warrant on 5346 East Royal Palm, in Scottsdale, Arizona.  During the search of the house, police recovered $749,000 in currency from vacuum-sealed bags (*see* Exhibit 2, Photo of Money Seized), a money counter, numerous cellular telephones, and miscellaneous documentation pertaining to members of the conspiracy.

Byrd was not present at the residence during the search.

## B.    Standing

As an initial matter, Byrd does not have standing to contest the search.  A defendant must have and assert a reasonable expectation of privacy in the subject premises.  *Rakas v. Illinois*,

439 U.S. 128, 143 (1978).  Here, at the time of the warrant, 5346 East Royal Palm was owned by Golshani Forousan/Rezvanieh, leased to Andrea King, and the utilities were in the name of Lincoln Davis.  (Exh. 1 at 17.)  Nothing was in the name of Richard Byrd (or any of his aliases).

Moreover, at the time of this search Byrd was in Phoenix, Arizona for a court appearance. Following his appearance, Byrd was arrested on another charge.  In response to standard questions regarding his pedigree, Byrd identified his residence as 8124 West Campbell, Phoenix. He told the police that he had lived at the West Campbell address for one year and five months. Thus, Byrd did not assert any privacy interest in 5346 East Royal Palm.

"The burden of showing a legitimate expectation of privacy in the area searched rests with the defendant."  *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).  "When attempting to determine whether a defendant has a reasonable expectation of privacy in property that is held by another, we consider such factors as 'whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from the property.'"  *Castellanos*, 716 F.3d at 833-34 (quoting *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992)).  In *Castellanos*, the court held that the defendant had failed to meet his burden to establish that he had an expectation of privacy in the vehicle searched.  *Id.* at 834.  There, the court explained, "Castellanos offered no evidence that he had any such interest, though he bore the burden of proof.  For example, Castellanos presented no evidence that Castenada (or anyone else) had granted him permission to use the vehicle or act as his agent with DAS, or any other right of any kind to the vehicle."  *Id.*

Here, Byrd has not only failed to claim an ownership or possessory interest in 5346 East Royal Palm, he actually disavowed the residence, telling officers at the time that he had been

living elsewhere for the past year and a half.

Byrd's role in the organization does not grant him any right. "It is well-established that a criminal defendant does not have standing to contest the search of a third party unless he can show he had a reasonable expectation of privacy in the area searched or the property seized." *United States v. Al-Talib*, 55 F.3d 923, 930-31 (4th Cir. 1995). In *Al-Talib*, the court rejected the defendant's claim that he had "a legitimate expectation of privacy in the Oldsmobile because he was [the owner's] supervisor and thus 'maintained considerable control' over the vehicle." *Id.* Likewise, although 5346 East Royal Palm was involved in activity related to his drug trafficking organization, Byrd cannot claim that involvement provided him with any separate privacy interest.

Therefore, he has not established standing to contest the validity of the search warrant or the evidence seized thereunder and his motion should be denied, without a hearing.

### C.    Search Pursuant To A Valid Search Warrant.

Moreover, the search was pursuant to a valid search warrant supported by probable cause. Once a warrant has been issued, review of the probable cause determination is to be shown great deference. *United States v. Blackwood*, 913 F.2d 139,142 (4th Cir. 1990); *accord United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006).

As detailed above, the affiant provided extensive evidence of Byrd's and Stewart's involvement in a drug trafficking organization, including Byrd's arrest a few weeks earlier while trying to purchase 2,700 pounds of marijuana. Moreover, he detailed the organization's extensive use of fake names and funnel accounts, Stewart's use of 5346 East Royal Palm, and the specific types of evidence likely to be found there, including cash and documentation. This provides ample probable cause to believe that a search of the premises would reveal evidence of

7

the crimes being investigated.  In contrast, Byrd has made no showing, other than a conclusory allegation, that the warrant was deficient in any way.  It clearly established that there existed "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinios v. Gates*, 462 U.S. 213, 238 (1983).  As a result, Byrd's motion should be denied.

> **D.      Reasonable Reliance On The Warrant.**

Assuming *arguendo* there was not probable cause for the issuance of the Warrant, the good faith exception to the exclusionary rule is applicable and therefore, the defendant's motion should be denied.  A warrant issued by a magistrate judge "normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search."  *United States v. Leon*, 468 U.S. 897, 922-23 (1984).  Reliance is unreasonable only where: (1) the agent provided knowingly or recklessly false information; (2) the magistrate judge wholly abandoned his judicial role; (3) the affidavit was so deficient in probable cause as to render reliance entirely unreasonable; or (4) the warrant was so facially deficient as to render reliance unreasonable.  *Id.*; *see also United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011).

Here, reliance on the warrant in question was reasonable.  As detailed above, the affidavit outlined ample basis for a finding of probable cause.   There is no indication that the affidavit included false information or that the judge somehow abandoned her role.  Thus, the defendant's motion should be denied and the evidence recovered from the East Royal Palm address should not be suppressed.

**III.    The Search of Storage Unit A331 at 4028 N. 7th Street, Phoenix, Arizona on March 7, 2011 was legal and the evidence recovered is admissible.**

Mr. Byrd has also filed a motion to suppress any evidence recovered during the March 7, 2011 search of Storage Unit A331 at 4028 N. 7th Street, Phoenix, Arizona.  (*See* Dkt. 301.)

A.     **Facts**

On March 6, 2011, Maricopa County (AZ) Superior Court Judge Monica S. Garfinkel also issued a search warrant for a storage locker – A-331 at Extra Space Storage on 4028 N. 7th Street, Phoenix, Arizona.  (Exh. 1.)  This was supported by the same affidavit discussed above. In addition to the information outlined above, the affidavit also explained that investigators had identified a storage locker rented by Stewart at 4028 N. 7th Street, Phoenix, Arizona and subpoenaed records for that storage unit, A-331.  (Exh. 1 at 22.)  The affiant explained that Stewart used a fake address on the account and requested access to the storage unit for Robert Smith, James Bowie, and Rasan Byrd.  (*Id.*)  The affiant also informed the judge that the storage unit was miles away from Stewart's house and there were several storage facilities closer to her residence.  (*Id.* at 23.)  The affiant also detailed what was seen on video surveillance of the storage unit, including footage of Stewart putting materials in the unit.  (*Id.* at 23-24.)  The affiant explained that there would have been plenty of space at Stewart's residence to store items and their belief that picking a unit further away from the home was likely part of an effort to conceal items away from the house after Byrd's arrest in February 2011.  (*Id.* at 24-25.)

On March 7, 2011, investigators executed the search warrant on storage unit A-331. During that search, investigators recovered a shopping bag that contained, among other things:

- A Bank of America check book box addressed to Smith at 6310 Calhoun Road, Houston, Texas;
- Citibank account opening information for an account in Robert Smith's name;
- Wachovia account opening information for an account Robert Smith's name;
- Thirteen Western Union $500 money order receipts;
- Insurance and medical documents for Byrd and Stewart;
- Documents related to a lawsuit in Miami against Robert Smith; and
- A hand note with information for Lincoln Davis.

They also recovered a copy of the rental agreement entered into by Stewart, a copy of

which is attached as Exhibit 3.

### B.       Standing

As an initial matter, the storage unit was rented by Stewart, not Byrd.  Someone does not have a reasonable expectation of privacy in the storage unit of another unless they have met their burden to prove otherwise.  *See United States v. Terry*, 258 Fed. Appx. 304, *1 (11th Cir. 2007) (defendant failed to prove he had reasonable expectation of privacy in storage unit that belonged to someone else).  Byrd has put forth no basis to believe that he had a reasonable expectation of privacy in the storage unit searched.  As a result, his motion should be denied.

Moreover, although people generally have a reasonable expectation of privacy in a storage unit they have rented but they do not have a reasonable expectation of privacy in a storage unit fraudulently rented.  *See United States v. Johnson*, 584 F.3d 995, 1001-02 (10th Cir. 2009).   In *Johnson*, the defendant directed his girlfriend to use a fraudulently obtained identification to rent a storage unit.  *Id.* at 1001.  The court found that, as a result, this violated the rental agreement and the defendant did not have a legitimate expectation of privacy in the storage unit.  *Id.* at 1003.   *See also United States v. McMahan*, 2011 WL 7052798, *1 (E.D. Tenn. 2011) (defendant who was listed as an emergency contact on storage unit and provided with a key had no reasonable expectation of privacy in the unit).

Here, Byrd has not asserted any involvement or interest in the storage unit.  Even were to do so, however, Stewart used a false address to obtain the unit and put Byrd's fake alias, Robert Smith, as an authorized user.  The rental agreement required Stewart to notify them of any address change within 10 days.  (Exh. 3 at 3.)  As a result, that fraud undermines the interest in the unit, as it did in *Johnson*.  Ultimately, Byrd did not have a reasonable expectation of privacy

in this storage unit and his motion should be denied.

C.      **Warrant Supported by Probable Cause**

In *United States v. Martinez*, 268 Fed. Appx. 593, 594 (9th Cir. 2008), the court found that the affidavit in question "had a substantial basis for finding probable cause and there was a reasonable nexus between the activities supporting probable cause and the location to be searched."

Here, as described above, the affidavit extensively outlined Stewart's involvement in Byrd's drug trafficking organization and money laundering.  It also explained the steps that Stewart had taken to obtain a storage unit, use a fake address, and to store items in the unit. Moreover, the affidavit explained the affiant's belief that these steps were likely taken to conceal items that Stewart did not want to keep at home and the extensive use of records by those involved in these types of conspiracies.  Thus, there was ample probable cause and nexus between the illegal activity and the place to be searched (i.e., the storage unit).  As a result, the defendant's motion should be denied.

D.      **Reasonable Reliance On The Warrant**

For the same reasons detailed above, even if the warrant was somehow lacking – and it was not – the investigators executing it were reasonable in relying on it in conducting their search.  The defendant has made no suggestion that there was anything false in the warrant or that the magistrate somehow abandoned her duty.  It provides ample probable cause. *See Leon*, 468 U.S. at 922-23.

IV.     **The May 8, 2014 search of 12315 Queens River Drive, Houston, Texas was legal and the evidence obtained is admissible.**

Mr. Byrd has also filed a motion to suppress any evidence recovered during the May 8,

2014 search of 12315 Queens River Drive, Houston, Texas.  (*See* Dkt. 303.)

**A.    Facts**

On May 8, 2014, United States Magistrate Judge Frances Stacy, of the Southern District of Texas, issued a search warrant for 12315 Queens River Drive, Houston, Texas.  (Attached as Exhibit 4 is a copy of the warrant issued for 12315 Queens River Drive.)  In support of the application for that warrant, Task Force Officer David Phillips submitted an affidavit.  (Attached as Exhibit 5 is a copy of the affidavit.)  That affidavit outlined the nature of the Byrd drug trafficking organization and particular seizures of money and drugs (Exh. 5 ¶¶ 14-16, 23-26) and provided detail about Kimberly Reid's involvement in that organization.  (*Id.* ¶¶ 17-.) Specifically, it explained that Reid moved money through her account to pay Byrd's bail (*id.* ¶ 17), hid evidence in a storage locker (*id.* ¶¶ 18-20), and her involvement in laundering large quantities of money for the organization.  (*Id.* ¶¶ 27-31.)  The affiant also explained that those involved in money laundering often use computers and other electronic devices to further their efforts and keep those items in their homes.  (*Id.* ¶¶ 27, 39.)  The affiant also explained surveillance of Reid at the target location.  (*Id.* ¶¶ 32-36.)  It further explained that the utilities at the target location were in a name that was also featured on a fake identification seized from Byrd at the time of his arrest.  (*Id.* ¶¶ 36-37.)

Investigators executed the search warrant on the same day.  During the search they recovered a number of items, including the following:

- Laptops and iPads;
- Cell phones;
- Numerous documents and photos;
- Richard Byrd's Arizona driver's license; and
- A copy of Richard's Byrd's indictment.

**B.      Standing**

A defendant does not generally have a reasonable expectation of privacy in the residence

of others, but there are certain circumstances in which they can, *see*, *e.g.*, *Minnesota v. Olsen*,

495 U.S. 91, 96-97 (1990) (holding that overnight guest had reasonable expectation of privacy).

A defendant, however, bears the burden of proving that reasonable expectation of privacy.  *See*

*Castellanos*, 716 F.3d at 833-34 (holding that the defendant did not meet his burden to establish

that he had a reasonable expectation of privacy in the vehicle of another).  As in *Castellanos*,

Byrd has made no showing that he has an expectation of privacy in Reid's residence, nor was he

present at the time of the search.  As a result, his motion should be denied.

**C.      Search Warrant Was Supported By Probable Cause**

As detailed above, the application for a search warrant included an affidavit that outlined

the investigation into Byrd's drug trafficking organization, Reid's role in the organization and

her extensive involvement in money laundering, and her connection to the target location and the

reasons it was likely that evidence would be found therein.

Thus, the affidavit set forth sufficient probable cause for the criminal activity and a nexus

between the place to be searched and the items to be seized.  *See United States v. Allen*, 631 F.3d

164, 174 (4th Cir. 2011) (holding that affidavit for warrant to search location for firearms

established sufficient probable cause).  As a result there was ample basis for the issuance of the

warrant and the defendant's motion should be denied.

**D.      Reasonable Reliance On The Warrant**

Assuming *arguendo* that there had been some issue with the probable cause in the

warrant, the investigators executing it were still reasonable in relying on it in conducting their

search.  The defendant has made no suggestion that there was anything false in the warrant or

that the magistrate somehow abandoned her duty.  The affidavit provides ample probable cause for the issuance of the warrant.  *See Leon*, 468 U.S. at 922-23.

## V.     The July 30, 2012 search of 8941 W. Montevista Road, Phoenix, Arizona, was legal and the evidence recovered is admissible.

Mr. Byrd has filed a motion to suppress any evidence recovered during the July 30, 2012 search of 8941 W. Montevista Road, Phoenix, Arizona.  (*See* Dkt. 165, 305.)

### A.     Facts

On July 30, 2012, police officers knocked on the front door at 8941 W. Montevista Road in Phoenix, Arizona and were greeted by Rasan Byrd.  The officers detected a strong odor of marijuana coming from the residence.  They asked Rasan Byrd about the smell of marijuana, and Rasan said that he had just smoked some marijuana and that there was a small amount of personal-use marijuana inside the house.  An officer patted down Rasan Byrd and recovered a small amount of marijuana from his pants.

The officers inquired if anyone else was inside the premises.  Rasan Byrd said that his brother was inside.  The officers identified themselves as police and directed Richard Byrd to walk to the front door of the premises.  Due to the strong smell of raw marijuana emanating from the house, the police detained Richard and Rasan Byrd.  An officer conducted a protective sweep of the home and observed spare furnishings and a quantity of marijuana on the kitchen counter.  A search warrant was obtained and the premises were searched.

Investigators then sought a warrant for the search of the location.  On the same date, Judge Alysson H. Abe of Maricopa County Superior Court issued a search warrant for 8941 Montevista Road.  (Attached as Exhibit 6 is a copy of that warrant and affidavit.)  The affidavit submitted in support of the application for the search warrant outlined the basis for probable

cause.  It explained the circumstances of the officers' approach to the target location and that a strong odor of marijuana was emanating from the house.  (Exh. 6 at 6.)  The affidavit also explained that when Rasan Byrd opened the front door the smell got stronger and that Rasan Byrd informed officers that he had been smoking marijuana and that there was a small amount in the house.  (*Id.* at 6.)  Further, it explained that investigators conducted a protective sweep of the location, during which they saw marijuana in plain view in the kitchen in an open coffee can and drug paraphernalia in plain view.  (*Id.* at 6-7.)

Investigators executed the search warrant on the same day and, during that search, they recovered more than $372,000 in currency secreted in the attic of the home, over twenty cellular telephones and miscellaneous documents.

### B.   Standing

Again, Byrd cannot establish standing to object to the search.  In order to successfully challenge a search under the Fourth Amendment, a defendant must have and assert a reasonable expectation of privacy in the subject premises.  *Rakas*, 439 U.S. at 143.  While it is possible for a person to "have a legitimate expectation of privacy in the house of someone else," *Minnesota v. Carter*, 525 U.S. 83, 89 (1998), it is still Byrd's burden to demonstrate such a reasonable expectation in this case.  *See United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) ("The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant.").

A residential lease for 8941 W. Montevista Road, water and utility bills were found for the premises and the lease and other services were in the names of third parties, and not Richard Byrd.  At the time of the search, Byrd denied living at the premises and told the police he had no personal property at the premises.  He also denied any knowledge of the money found in the

15

attic.  *See United States v. Stevenson*, 396 F.3d 538, 544 (4th Cir. 2005) (holding that defendant had no reasonable expectation of privacy where, "by the time of the search on January 24, 2003, Stevenson had 'no intention of returning to his apartment' and 'no longer considered himself a resident of the apartment'").  Here, Byrd indicated prior to the search that he did not live at 8941 W. Montevista Road and did not have any property there.

Moreover, Byrd has not asserted any privacy interest in the premises.  Therefore, he has not established standing to contest the search warrant or the evidence seized.

### C.   The Search Was Pursuant To A Lawful Warrant Supported By Probable Cause.

Even if Byrd had standing, which he does not, the warrant laid out the circumstances that provided ample basis to believe that there was evidence of a crime therein.  Specifically, it explained that officers had smelled marijuana coming from the house, that both occupants said they had been smoking marijuana, and that officers saw marijuana and paraphernalia in plain view during their protective sweep.[2]  Thus, there was clear basis to believe that the search of the location would uncover evidence of a crime.  The defendant's motion should be denied without a hearing.

### D.   Even Were The Warrant Lacking Probable Cause, The Officers Executing It Were Justified In Relying Upon It.

Even were there some fault with the warrant, the investigators executing it were still reasonable in relying on it in conducting their search.  The defendant has made no suggestion that there was anything false in the warrant or that the magistrate somehow abandoned her duty.

---

[2]     Of course, the initial protective sweep of the location was permissible.  *See United States v. Jones*, 667 F.3d 477, 484-85 (4th Cir. 2012) (upholding protective sweep of house incident to arrest).

The affidavit provides ample probable cause.  *See Leon*, 468 U.S. at 922-23.   Thus, the defendant's motion should be denied.

## VI.   Mr. Byrd's April 29, 2014 Arrest And The Subsequent Search Of His Bag Were Legal And The Evidence Obtained As A Result Is Admissible.

Mr. Byrd has filed a motion to suppress any statements or evidence recovered at the time of his arrest on April 29, 2014 in Phoenix, Arizona.  (See Dkt. 165, 305.)

### A.   Facts

On April 17, 2014 Byrd and several others were indicted by a federal grand jury in Maryland.  On the same day, United States Magistrate Judge Susan K. Gauvey issued an arrest warrant for Byrd.  (Attached as Exhibit 7.)

On April 29, 2014, Byrd was arrested by police in Arizona.  After he was arrested and transferred to the U.S. Marshals, Byrd said he suffered from PTSD and asked officers to obtain his medication from his bag, which was in the vehicle in which he had been traveling. Detectives asked the individual that had been traveling with Byrd about his medication but that individual was not aware of any medication.  He did direct officers to a backpack and duffel bag that were Byrd's.  Investigators looked through these for medications but found none.  In these materials, however, were a number of cellular phones and a recently-issued Louisiana identification with Byrd's picture but bearing the name Ebunoluwa Akinola.  There was also a prepaid American Express card in the same name.

### B.   Mr. Byrd's Bag Was Searched Pursuant To His Consent.

The United States does not seek to use any statements made by Byrd as the result of that lawful arrest in its case-in-chief.    It will seek to use, however, evidence that Byrd was in possession of a Louisiana State Identification card and a pre-paid American Express card in the

name of Ebunoluwa Akinola.

As an initial matter, said evidence was seized pursuant to a lawful arrest and was therefore lawfully obtained by police. *See Michigan v. DeFillippo,* 433 U.S. 31, 35 (1979).   In *United States v. Banks*, 482 F.3d 733, 738 (4th Cir. 2007), the court held that a detective's inventory of the defendant's bags was appropriate.   There, when the defendant was arrested, the detective asked him if there was anything he would like to bring with him and he identified two bags from the vehicle he had been in. *Id.* at 736-37.   At the station, the detective opened the bags to inventory them and immediately saw contraband. *Id.*

Ultimately, by asking agents to retrieve medication, Byrd consented to the search of his bag. *See United States v. Hylton*, 349 F.3d 781, 787 (4th Cir. 2003); *United States v. Williams*, 106 F.3d 1173, 1177-78 (4th Cir. 1997).   In *Hylton*, the court affirmed the denial of the defendant's motion to suppress a gun recovered from his home.   There, the defendant's girlfriend called the police because, after an argument, the defendant would not let her back into their apartment. *Id.* at 783.   She told police that she wanted to get into the apartment but she did not feel safe because the defendant had a gun under the bed. *Id.* at 783.   She also said that the defendant had used the gun to rape her a week earlier. *Id.*   The court found that, even if she did not use the word consent, the defendant's girlfriend had consented (at least impliedly so) to the search of the apartment and the bedroom where the firearm was located because she sought police assistance in making her home safe again and specifically directed them to the location of the firearm. *Id.* at 787.   Ultimately, the only reason that she contacted the police was to ensure her apartment was secure and that she could re-enter it and the only reason to inform the police of the gun and its location was so that they could retrieve it.

In *United States v. Williams,* the Fourth Circuit affirmed the district court's denial of the

defendant's motion to suppress the search of packages he sent to a confidential informant working with the DEA.  106 F.3d at 1177-78.  There, the defendant had sent a package to the confidential informant, who then provided it to the DEA.  The Court found that, when the defendant sent the package to the informant, he was consenting to the opening and search of the package by the confidential informant, or other individuals to whom the informant gave the package.  *Id.*

Likewise, in this situation, Byrd actually asked the officers to obtain his medication and told them that they would find it in his bag.  As was the case in *Hylton* and *Williams*, even if Mr. Byrd did not expressly tell the investigators to search his bag, that directive was implied by asking for the medication and instructing investigators that it could be found in his bag.  Thus, Byrd's motions should be denied.

## VII.   The June 9, 2010 Stop in Avondale, Arizona Of A Truck In Which Mr. Byrd Was Riding Was Legal And The Evidence Gathered During That Stop Is Admissible.

Mr. Byrd has also filed a motion to suppress any evidence recovered during a June 9, 2010 traffic stop in Avondale, Arizona.  (Dkt. 165, 308.)

### A.   Facts

On June 9, 2010, Byrd was pulled over by Avondale (AZ) police.  At the time he was operating a rented Enterprise box truck and police saw him make an illegal U-turn and fail to obey a clearly posted traffic control device.[3]  During that stop, Byrd produced a California driver's license in the name of Robert Smith.  A computer check by the officer determined that

---

[3]      Byrd was given a citation for failing to obey a traffic control device and driving on a suspended license.  On November 1, 2010, Byrd, under the alias of Robert Smith, pleaded guilty to both violations and was fined.  (Attached as Exhibit 8 is a copy of that plea agreement.)  Byrd was represented by counsel and both signed a plea agreement.  As a result, Byrd cannot contest the basis for the traffic stop.

"Robert Smith" had a suspended Arizona driver's license.  The passenger inside the truck was Maurice Jones, a co-conspirator of Byrd.  Jones also had a suspended Arizona driver's license. The officer detected an odor of fresh marijuana coming from the truck, and also determined that the vehicle had to be towed to the impound lot because both occupants possessed suspended licenses.

An inventory was conducted by the officer, who determined that the truck contained 13 large black plastic containers.  Each was empty but smelled of marijuana.  No marijuana was discovered inside the truck.  When questioned by the officer, Byrd stated that he was in the flooring business and had purchased the black containers at a Home Depot.  When asked to produce a receipt for the containers, Byrd was unable to do so.

### B.     The Traffic Stop Was Appropriate.

Traffic violations "provide[] sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop."  *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008); *see also Whren v. United States*, 51 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Here, as detailed above, an officer saw Mr. Byrd's vehicle make an illegal U-turn and stopped him for the violation (to which Byrd ultimately pled guilty).  Thus, the initial stop of the truck was supported by probable cause to believe it had committed a violation.  *See Branch*, 537 F.3d at 335.

### C.    Mr. Byrd's Statements During The Encounter Are Not Subject To Suppression.

Byrd was not under arrest at any point in time.  Moreover, *Miranda* warnings are not required when a person is questioned during a routine vehicle stop.  *United States v. Sullivan,* 138 F.3d 126, 130-32 (4th Cir. 1998).  In addition, personal information taken to establish identity or residence does not constitute interrogation for purposes of *Miranda*.  *See Pennsylvania v. Muniz,* 496 U.S. 582, 600-01 (1990); *United States v. D'Anjou*, 16 F.3d 604, 608-09 (4th Cir. 1994).  Thus, none of Byrd's statements are subject to suppression.

### D.    The Search Of The Truck Was Permissible.

The search of the truck was permissible on two separate grounds.  First, the officer detected an odor of marijuana coming from the truck.  An officer who detects the odor of marijuana emanating from a vehicle has probable cause to search that vehicle.  *United States v. Lewis*, 606 F.3d 193, 197-98 (4th Cir. 2010) (citing *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004)).  Second, both occupants of the truck had suspended driver's licenses and could not operate the vehicle.  Thus, the truck had to be towed and inventoried consistent with the procedures of the Avondale Police Department.  Neither a warrant nor probable cause is required for an inventory search.  *South Dakota v. Opperman*, 428 U.S. 364, 374-76 (1976); *United States v. Brown*, 787 F.2d 929, 931-32 (4th Cir. 1986).  The inventory search conducted herein was performed in accordance with standardized police department procedures.  Byrd makes no contrary allegation.  *United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007) (citing *Illinois v. Lafayette*, 462 U.S. 640, 644-46 (1983)).

Thus, the statements made by Byrd, and the observations of the traffic officer regarding the contents of the vehicle and the odor of marijuana, during the course of the valid stop are both

admissible.

## VIII. Evidence Seized And Statements Made By Byrd During The February 17, 2011 "Sting Operation" in Chandler, Arizona Are Admissible.

Mr. Byrd has also filed motions to suppress evidence related to the February 17, 2011 law enforcement sting operation in Chandler, Arizona. (Dkt. 165, 309.)

### A.  Facts

On February 16, 2011, a confidential informant told the Chandler police department that he had been put in touch, through contacts in Mexico, with an individual ("Jesse") that was looking to purchase large quantities of marijuana. The CI met Jesse in a parking lot where they discussed quantity (500-800 pounds) and price ($480 per pound). Jesse made clear that he needed a large quantity because no one else was able to provide him more than 100 pounds. Jesse checked the quality of the marijuana and said that it would be acceptable to the buyer.

The next day, Jesse and the CI discussed the terms of the deal – that the initial deal would be for 500 pounds but that they would conduct multiple transactions to total 2,000 pounds.

Investigators equipped a police controlled warehouse with recording devices and parked a vehicle containing 650 pounds of marijuana in the warehouse. That night, at approximately, 8:54 p.m., Byrd arrived at the warehouse. The CI showed Byrd the bales of marijuana and Byrd suggested that they could weigh one bale and calculate the total number of bales required from that. Byrd then went out to his vehicle and retrieved a suitcase. He brought it inside and opened it, revealing a large quantity of currency. The CI placed one of the bales on a table and Byrd touched the marijuana and pressed on it to determine the moisture and compaction. Byrd then said that he would buy 500 (i.e., pounds) that night and the rest in the morning. He explained that he wanted a total of 2,700 pounds and said that he would be the one paying the CI. Byrd

22

was then arrested.[4]

The suitcase he had presented was found to contain approximately $267,920 in cash.  At the time of his arrest, he was in possession of nine cellular telephones and provided, as identification, a driver's license in the name of Robert Smith.

After Mr. Byrd was arrested, law enforcement transported his vehicle (a Chevrolet Suburban) back to the police department and conducted a routine inventory search of the vehicle. A search of Byrd's vehicle revealed an additional $18,000 in the glove compartment, in addition to numerous cellular telephones, and various documents.

### B.      Outrageous Government Conduct

In his motions Mr. Byrd makes the passing claim (without any explanation, support or specific request for relief, of course) that the reverse sting operation consisted of "outrageous government conduct."  (Dkt. 165.)

Outrageous government conduct, however, is limited to extreme cases in which the government's conduct violates fundamental fairness and is "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment."  *United States v. Russell*, 411 U.S. 423, 431 32 (1973).  As our Circuit Court explained in *United States v. Hasan*, 718 F.3d 338, 343 (4th Cir. 2013), "the outrageous conduct doctrine survives in theory, but is highly circumscribed…a due process violation may only be found when the conduct at issue is outrageous not merely offensive."  Indeed, as the Court in *Hasan* pointed out, "this Court has never held in a specific case that the government has violated the defendant's due process rights

---

[4] The United States will make a copy of the audio/video available should the Court deem it appropriate.

through outrageous government conduct." *Id.*

Entrapment, the Circuit Court has made clear, is an affirmative defense at trial and does not support dismissal of an indictment on due process grounds. According to the Circuit Court in Hasan,

> The defense of entrapment is not intended to give the federal judiciary a chancellor's foot veto over law enforcement practices of which it did not approve….If the result of the government activity is to implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission, the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.

718 F.3d at 342-343.

Courts, including this one, have found that sting operations do not violate due process. *See United States v. Velasquez Lopez*, 510 Fed.Appx. 559 (9th Cir. 2013) (Government's conduct was not outrageous, as would warrant dismissal of indictment, in arranging sting operation intended to catch criminals involved in home invasion robberies in which defendant and others were recruited to steal large quantities of cocaine from fictional stash house, where government knew that there was epidemic of violent home invasions in the area); *United States v. Lopez Mejia*, 510 Fed.Appx. 561 (9th Cir. 2013) (Government's conduct in setting up sting operation intended to catch criminals involved in home invasion robberies in which defendant and others were recruited to steal large quantities of cocaine from fictional stash house was not so outrageous as to warrant dismissal of charges for conspiracy to possess with intent to distribute cocaine and possession of firearm); *United States v. Antonio Davis*, 2013 WL 4026969 (D.Md. 2013).

Here, Mr. Byrd had been involved in transporting large quantities of narcotics across the

country for some time.  (For example, the box truck stop in Avondale referenced above occurred approximately 8 months before the sting.)  Byrd's representative (Jesse) contacted a CI looking to purchase large quantities of marijuana.  The CI agreed to provide him with the opportunity to do so.   Byrd's representative arranged to purchase a large quantity of marijuana and Byrd showed up to the initial purchase with more than a quarter of a million dollars in cash as a down payment on the drugs.  At no time did anyone threaten, coerce or badger Mr. Byrd into agreeing to purchase the marijuana.  In fact, the entire transaction was initiated by Byrd.  In all, there is nothing about this government operation that is either "shocking" or offensive to traditional notions of fundamental fairness.  Accordingly, Mr. Byrd's motion should be denied.

### C.      Mr. Byrd's Arrest Was Legal.

Warrantless arrests and searches incident thereto are permitted where there is probable cause to believe a felony has been committed or is in the process of being committed by the person under arrest.  *Maryland v. Pringle*, 540 U.S. 366 (2003); *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004).  Probable cause exists if a reasonable and prudent officer would believe that the suspect has committed, is committing, or is about to commit an offense. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  Probable cause is determined upon "the totality of circumstances" surrounding the particular defendant and the events leading to the arrest. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983).  Courts should apply a streetwise and common sense assessment of the factual circumstances and should show deference to the expertise and experience of law enforcement officers.  *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004); *Dickey-Bey*, 393 F.3d at 453.   Lastly, probable cause involves an assessment of probabilities rather than certainties.  *Gates*, 462 U.S. at 230; *Dickey-Bey*, 393 F.3d at 454.

Here, there was ample probable cause to arrest Mr. Byrd.  He had produced more than

one-quarter of a million dollars in cash to law enforcement to purchase 500 pounds of marijuana. He had personally examined and approved of the quality of a sample of the marijuana. These actions were committed in the presence of the officers, on video and audio recording, and provided ample probable cause for a warrantless arrest. The statements made prior to his arrest, and the search incident to that arrest, were valid and should not be suppressed.

### D.      Statements Made By Mr. Byrd Are Admissible.

The statements made by Byrd during the attempted purchase of the marijuana, as well as the money and other evidence seized from him at the time of his arrest, are not subject to suppression. The statements made by Byrd during his interaction with the officers and informants are the *res gestae* of the conspiracy and are properly admissible. *See*, *e.g.*, *United States v. Copeland*, 295 F.2d 635, 637 (4th Cir. 1961) (holding that instructions given and orders made as a part of an illegal whiskey distilling conspiracy were admissible as *res gestae*). Byrd was not in custody during the sting and, as a result, *Miranda* is not applicable. Moreover, the arrest of Byrd was proper after he sought to commit a crime, i.e., the purchase of more than one ton of marijuana.

### E.      The Search Of Mr. Byrd's Vehicle Was Valid.

As noted above, an inventory search of a vehicle is entirely proper and neither a warrant nor probable cause is required. *South Dakota v. Opperman*, 428 U.S. 364, 374-76 (1976); *United States v. Brown*, 787 F.2d 929, 931-32 (4th Cir. 1986). The inventory search conducted herein was performed in accordance with standardized police department procedures. Byrd makes no contrary allegation. *United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007) (citing *Illinois v. Lafayette*, 462 U.S. 640, 644-46 (1983)). As a result, Mr. Byrd's motion to suppress the evidence recovered should be denied.

**IX.    Law Enforcement Use of GPS Tracking Devices (Dkts. 165, 302).**

Mr. Byrd has also moved to suppress the Government's use of any GPS tracking data obtained from his telephones (Dkts. 165, 302.)

**A.    Facts**

The Government only intends to use GPS tracking data obtained on one phone used by Mr. Byrd during one period.  Specifically, on September 5, 2013, United States Magistrate Judge Beth P. Gesner issued a tracking warrant authorizing the tracking of AT&T cellular phone number 786-503-3482 for a period of 45 days.  Attached as Exhibit 9 is that warrant and the affidavit submitted in support.[5]

Judge Gesner issued the tracking warrant based on a finding of probable cause.  (Exh. 9 at P-0072.)  The affidavit submitted in support of that warrant outlines the basis for that probable cause determination.  Specifically, it provides additional details about the investigation into Mr. Byrd's drug trafficking activities.  (*Id.* at P-0081-88.)  In addition, it detailed the efforts to which Mr. Byrd had gone to launder the proceeds from those activities.  (*Id.* at P-0088-92.)  The Affidavit explained that a confidential source had provided the 786-503-3482 number as one that was being used by Byrd.  (*Id.* at P-0092.)  And, that investigators had obtained a prior tracking warrant on the same phone and, based on the location data from that warrant, they had been able to locate and conduct surveillance of Byrd.  (*Id.* at P-0093.)  The warrant also explained that the GPS tracking of the phone would likely identify various aspects of the drug organization,

---

[5]     This was an extension of a prior tracking warrant, which was signed by U.S. Magistrate Judge Nancy Johnson of the Southern District of Texas on August 6, 2013.  For reference, a copy of that warrant and supporting affidavit are attached hereto as Exhibit 10.

including patterns of travel, vehicles, stash houses, sources of supply, and other members of the narcotics conspiracy.  (*Id.*)

### B.        GPS Tracking Data Was Obtained Pursuant To A Valid Warrant.

"Subject to certain exceptions that are not applicable in this case, police officers must obtain a warrant to conduct a search or seizure."  *United States v. Gibbs*, 547 F. App'x 174, 178 (4th Cir. 2013) (citing U.S. Const. amend. IV; *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010)).  "An affidavit supporting a warrant that authorizes a search or seizure 'must provide the magistrate with a substantial basis for determining the existence of probable cause' in light of the totality of the circumstances."  *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).  "'[T]o establish probable cause, the facts presented to the magistrate need only warrant a man of reasonable caution to believe that evidence of a crime will be found.'" *Id.* (citing *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (per curiam) (internal quotations omitted)).

In *Gibbs*, the Fourth Circuit held that the affiant provided sufficient probable cause for the GPS monitoring of the defendant's cell phone.  *Id.* at 179.  There, the court found extensive evidence of the drug dealing activities of the defendant's associates and of the defendant's role in delivering money to them.  *Id.*  It also established that the tracking would reveal information about the drug operations, including the locations of drugs or proceeds.  *Id.*

As in *Gibbs*, the agents here obtained a valid warrant, supported by probable cause and issued by a U.S. Magistrate Judge, for the GPS monitoring conducted of Byrd.  They detailed Byrd's extensive involvement in drug trafficking and money laundering (Exh. 9 at P-0081-92) and explained the ways in which tracking his phone would provide evidence of the underlying crimes – i.e., vehicles, stash houses, sources of supply.  (*Id.* at P-0093.)  Thus, there was ample probable cause to support the GPS monitoring of this phone and Byrd's motion should be denied.

**C.   Even Were The Warrant Lacking, Investigators Were Reasonable In Relying On It.**

Assuming *arguendo* there was not probable cause for the issuance of the tracking warrant, the good faith exception to the exclusionary rule is applicable and therefore, the defendant's motion should be denied.  The defendant makes no allegation that any aspect of the warrant was lacking, much less that anything in the warrant was false.  Moreover, the affidavit had ample probable cause to support the issuance of the warrant so the defendant cannot suggest that the magistrate abandoned her role or that reliance upon the warrant was unreasonable.  Because the agents acted reasonably in relying upon the warrant, the defendant's motion should be denied.  *See Leon*, 468 U.S. at 922-23.

**X.   Mr. Byrd Is Not Entitled To Any Information About Confidential Informants.**

Mr. Byrd has also filed a motion seeking to have the Government disclose any confidential informants used during the course of the investigation.  (Dkt. 311.)  As an initial matter, the Government will, pursuant to the discovery agreement entered into with Mr. Byrd's counsel, provide counsel with the identities and related *Jencks* material for all witnesses that it plans to call at trial.  As a result, the Government understands that the only issues remaining in Mr. Byrd's motion is whether the Government will disclose the identities of any confidential informants who have provided information but will not be testifying at trial.  For the following reasons, Defendant's motion should be denied.

In *United States v. Roviaro*, the Supreme Court held that under certain circumstances, the Government can withhold from disclosure the identity of confidential informants in order to further the public's interest in effective law enforcement.  *Roviaro,* 353 U.S. 53, 59 (1957).  According to the Court, "the privilege recognizes the obligation of citizens to communicate their

29

knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* at 59. As the Fourth Circuit noted in *McLawhorn v. State of North Carolina*,

> law enforcement officers dealing with a large number of crimes, especially in the area of the narcotics traffic, must depend upon informants to furnish information concerning criminal activities; privileged communications of this nature must be encouraged if law enforcement officers are to be held to the task of solving and prosecuting crime; if the identity of the informant must be routinely disclosed undoubtedly such sources of information would disappear almost immediately.

*McLawhorn,* 484 F.2d 1, 4 (4th Cir. 1973).

This privilege, however, is a qualified one, and where the disclosure of an informer's identity, or of the contents of his communication, is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro,* 353 U.S. at 61. In making that determination, Courts must weigh the competing interests of the public and the defendant in light of the particular circumstances of each case. As the Court held in *Roviaro*:

> No fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62.

In order to justify disclosure, a defendant must come forward with something more than speculation as to the usefulness of such disclosure and disclosure is not required despite the fact that a criminal defendant may have no other means of determining what relevant information the informant possesses. *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985). Indeed, disclosure is only required after a court has determined that the informer's testimony is highly

30

relevant. *Id*. One of the most important factors to be considered is the materiality of the evidence to the defendant's particular defense. *Id.*

In making this determination, the Fourth Circuit has drawn a distinction between informants who are "participants" in a criminal transaction, and those that are "mere tipsters." *United States v. Price,* 783 F.2d 1132, 1138 (4th Cir. 1986). Where the informant is an actual participant in the crime charged, particularly where the informant helped to initiate the criminal act, disclosure will likely be required. *See*, *e.g.*, *Roviaro,* 353 U.S. at 64-65 (disclosure required where the informant set up the drug purchase later charged and was the sole witness to its execution); *Price,* 732 F.2d at 1139 (disclosure required where the informant set up and participated in negotiations for the illicit sale of a truckload of meat which formed the basis of the charge against the defendant); *McLawhorn*, 484 F.2d at 6-8 (disclosure required where the informant set up and participated in the drug transaction for which the defendant was later charged). As the Circuit Court held in *Price,* "one of the factors tending to show that the prosecution is not entitled to withhold from the accused information as to the identity of an informant is the qualification of the informant to testify directly concerning the very transaction constituting the crime." *Price,* 783 F.2d at 1138.

On the other hand, disclosure is not required where the informant "is neither a participant in the offenses, nor helps set up its commission, but is a mere tipster who only supplies a lead to law investigating and enforcement officers." *Price* 783 F.2d at 1138*; see also United States v. Mabry,* 953 F.2d 127, 131-132 (4th Cir. 1992) (disclosure not required where the informant introduced the defendant to undercover law enforcement officers but did not witness the drug transaction later charged); *United States v. Brinkman*, 739 F.2d 977, 981 (4th Cir.1984) (disclosure not required where the informant introduced the defendant to an undercover law

enforcement officer posing as a hitman).  Where an informant merely provides information that furnishes probable cause for a search and seizure, disclosure is generally not be required.  *See e.g. United States v. Gray,* 47 F.3d 1359, 1365 (4th Cir. 1995) (disclosure not required where the informant provided information used to establish probable cause for a search warrant); *United States v. Poms*, 484 F.2d 919. 922-923 (disclosure not required where informant provided information utilized in a *Terry* stop); *United States v. Fisher,* 440 F.2d 654, 656 (4th Cir. 1971). In such cases, the identity of a tipster would not be essential in preparing the defense of the accused and, therefore, the public interest in protecting such informants weighs heavily in favor of nondisclosure.  *Price,* 783 F.2d at 1138.

In the case at hand, Byrd is charged with long-term conspiracies to distribute drugs and launder money.  During the course of that investigation, agents obtained information from a number of different sources about the activities of those involved in the conspiracy.  With one exception, however, none of these individuals were directly involved in the acts that will be presented at trial.[6]  Rather, the evidence that will be presented at trial will be from officers about what they did and saw, and from cooperating witnesses (who will be disclosed, of course).

As a result, there is no reason to believe that the identity of any CI can offer evidence material to the crime charged or any defense to the charges that the Defendant might offer.

At the same time, given the Defendant's criminal history, and his alleged involvement in the murder of three people in North Carolina and the murder of another in Jamaica,  the Government has serious concerns about the CIs' safety should their identities and contact

---

[6]        To the extent it has not been already, the identity of the informant involved in the 2011 Chandler, Arizona sting will be disclosed through case materials about the sting.

information be revealed.  Above and beyond the general public interest in encouraging citizens to cooperate with law enforcement, the Government believes that this safety issue militates in favor of non-disclosure.

Therefore, insofar as the CIs can offer no evidence as to the crime charged or any possible defenses and given the Government's concerns about the CIs' safety, the balancing of the competing factors articulated in *Roviaro* clearly weigh against disclosure of the CIs' identities.  Accordingly, Defendant's motion should be denied.

## XI.  The Government Does Not Plan To Use Any Evidence Pursuant to Rules 404(b) or 609 In Its Case In Chief.

Mr. Byrd has also filed a motion seeking to have the Government disclose any evidence it intends to use pursuant to Federal Rules of Evidence 404(b) or 609.  (Dkt. 311.)

The Government has alleged in its indictment that, from 2009 through April 2014, Mr. Byrd was involved in conspiracies to distribute illegal drugs and to launder money.  (Dkt. 231.) As a part of that conspiracy, the Government has also alleged that Mr. Byrd was involved in a number of overt acts during that time period.  (*See id.* ¶ 4.)

Although the Government plans to introduce evidence of Mr. Byrd's involvement in the conspiracies, in part via actions that Mr. Byrd took during the course of the conspiracy, it does not intend to offer evidence of Mr. Byrd's prior bad acts (pursuant to Rule 404(b)).

The Government does hereby provide notice to Mr. Byrd that it intends to use his 1995 conviction in Baltimore County for CDS: Poss w/Int Manf/Dist/Disp (case no.: 593070019; conviction date: 02/17/1995) to impeach Mr. Byrd should he choose to testify.  Notice of this conviction was included in the Government's Notice of Enhanced Penalty, filed at Docket Number 110.

As a result, all notice has been provided and this motion is moot.

## XII.   Motions Hearing

The Court has scheduled a motions hearing in the above matter for August 16, 2016 at 10:00 a.m.  The Government will, of course, be prepared to address all of the pending motions at that time.   A number of the motions, however, do not require witnesses.[7]   At this time, the government anticipates presenting witness testimony related to the following issues:

- The July 30, 2012 Search of 8941 W. Montevista Road, Phoenix, Arizona (Dkt. 165, 305);
- The April 29, 2014 Arrest of Mr. Byrd in Phoenix, Arizona (Dkt. 165, 306);
- The June 9, 2010 Traffic Stop in Avondale, Arizona (Dkt. 165, 308); and
- The February 17, 2011 "Sting Operation" in Chandler, Arizona (Dkt. 165, 309).

If the court requires additional witness testimony the Government would be happy to address that in advance of the scheduled hearing.

---

[7]        For example, those that can be resolved based on lack of standing or on the four corners of a warrant affidavit.

## CONCLUSION

WHEREFORE, the United States respectfully requests that the within motions be decided consistent with the positions of the government as set forth herein.

 Respectfully submitted,

Rod J. Rosenstein
United States Attorney

____/s/_____
James G. Warwick
Kenneth S. Clark
Assistant United States Attorneys
36 S. Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800
james.warwick@usdoj.gov
kenneth.clark@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of July, 2016, I electronically filed the foregoing

Government's Consolidated Motions Response with the Clerk of Court via CM/ECF and thereby

served all counsel of record.

_____/s/_____
Kenneth S. Clark