IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No.:  RDB-14-0186 |
| Plaintiff, | ) | |
| v. | ) | |
| RICHARD BYRD, | ) | |
| Defendant. | ) | |

## MOTION TO CLARIFY NOVEMBER 1, 2016 HEARING RECORD AND ENJOIN A MANIFESTLY UNJUST GUILTY PLEA

COMES NOW undersigned counsel, Vandy L. Jamison, Jr., respectfully submits the aforementioned motion and in support thereof states the following:

1.	On November 1, 2016, a hearing was held regarding the November 7, 2016, trial date in this matter.

2.	On or about October 31, 2016, I was contacted by Defendant Richard Byrd's court appointed attorney, Mr. Lawlor.  Mr. Lawlor indicated that Defendant Byrd informed him that I was retained.  Mr. Lawlor then indicated that I should appear before the Court and enter an appearance.

Mr. Lawlor advised, without further comment, that given the Court's scheduling, the November 1, 2016 hearing was the time to "get in" the case.

3.	Unfortunately, I accepted Mr. Lawlor's representations without questioning him further regarding my appearance, the government or the Court's likely posture regarding same.

Mr. Lawlor, by implication, indicated substitution of counsel would be pro forma.

1

4. On November 1, 2016, I arrived at the Court early, approximately 1:45 p.m. with the intention of having a legal visit with the Defendant prior to the hearing. This was accomplished.

5. Also there early was the public defender, Mr. Lawlor. Mr. Lawlor, from all I could gather while in the visiting area and then later, was forcefully attempting to convince Defendant Byrd to plead guilty.

6. This is very significant since it is now plain to me that Mr. Lawlor was perfectly cognizant of this Court's posture toward new counsel and any further delay in trial. Mr. Lawlor purposefully provided none of that insight to me. Such information would have allowed me a different approach to seek the Court's permission to enter my appearance in the case.

7. My legal visit with Defendant Byrd, once Mr. Lawlor excused himself from the room, was emotional, and highly charged. Defendant was extremely encouraged that I was there. Mr. Lawlor, according to Defendant Byrd, told him I was not coming to court for him. This rings true and is consistent with what I observed from Mr. Lawlor in court within the subsequent hour.

8. I ended the interview with Defendant Byrd at approximately 2:35 p.m. in order to go up to the courtroom and check-in with the clerk.

9. Subsequently, Mr. Warwick, apparently, the lead prosecutor, appeared in the courtroom and inquired of me in a very openly condescending and hostile manner, if I was prepared to go to trial on November 7, 2016.

10. As best I can recall, I responded to Mr. Warwick in kind but made no commitment regarding trial readiness as it was a question he already had an answer for. I then

overheard Mr. Warwick make a comment regarding "not intending to be offensive toward me and still not having to care for or like something" or words to that effect.

11. Upon entering the courtroom, per my custom, I introduced myself to the courtroom clerk. We exchanged pleasantries and I told him he probably was familiar with friends of mine, Billy Murphy, Esq. and Kenneth Ravenell, Esq. since they practiced at the court frequently. Also, I believe I mentioned to the clerk that the portrait hanging near his desk happened to be of a dear friend, mentor and former professor of mine, the Honorable Alexander Williams, a now retired judge from the U.S. District Court in Greenbelt, Maryland.

12. At or about this time, to my exclusion, Messrs. Warwick and an associate; Mr. Lawlor and, I believe, his associate were called back to the Judge's chambers.

13. After approximately 10 minutes, the clerk I had been talking with was called from chambers and instructed to verify whether I was a member of that Court's bar. The clerk inquired if I was and I informed him that my recollection was yes, of course. I suggested he call the clerk's office to confirm. He did so. The clerk confirmed that I was then and am now a member in good standing of that Court's bar.

14. I was never asked, after the clerk confirmed my active membership, to come back and join the other lawyers in chambers.

15. Thereupon, approximately five minutes or so passed and the Court took the bench.

16. At this point, a smug Mr. Warwick and his associate, as well as Mr. Lawlor, reentered the courtroom and took their seats. I was seated at the end of the defense table.

17. Upon taking the bench and without extending any semblance of professional courtesy, you, Judge Bennett, proceeded to refer to me in the most bellicose and disrespectful

manner. As an analogy, it was as if I was some slave that had wandered on to a busy plantation and was quite the irritant.

18. Because of the aspersions that I felt were cast upon my name, I asked to be allowed to make a record which was permitted. Unfortunately, at that moment, the record that I made did not extend far enough.

19. For the record, I mistakenly thought I was in a courtroom not a railroad station. I thought I would encounter a judge, not the railroad station's chief conductor.

I am more familiar with how seasoned and thoughtful Judge's conduct even contentious courtroom issues.

20. Further, not only did I personally hear and observe a disheveled Mr. Lawlor vociferously berating Defendant Byrd, even cursing at him mouth to ear, about accepting the plea, Mr. Lawlor had the gall, after the Court's tirade directed at me, to tell Defendant, "See, Jamison is a nice guy but he can't handle this Judge. You have to plea! I've had one foot in and one foot out of this case since you told me you were retaining Jamison. I'm not able to go to trial."

21. For the record, no experienced lawyer should have to "handle a judge." The facts, the Rules of Procedure on judicial decorum and most importantly, the United States Constitution handles good judges.

22. My initial inclination was to leave this matter alone. I have nothing to prove to Judge Bennett or the others gathered for that hearing. Certainly, not after what I observed in that courtroom on November 1, 2016.

23. However, demand that I clarify November 1 as well as November 2, 2016, when additional demeaning comments were apparently directed to me in my absence from the bench.

24. Defendant Byrd's plea was not voluntary.  It was and is the "product of intense pressure and legal bullying"—the worst I have ever seen in my 24 years of practicing law.

25. If Mr. Lawlor, a well-known "plea daddy" is in any way representative of the lawyers Judge Bennett handpicked to represent Defendant Byrd in a case of this magnitude and under the pretense of running an efficient courtroom, the Sixth Amendment has been done a grave disservice.

## CONCLUSION

Defendant Byrd's guilty plea is and was not voluntary.  His Rule 11 colloquy was a shameful sham and an embarrassment to any competent court of law.  Had I been allowed to enter my appearance and pick a constitutionally meaningful date for trial, no plea would have taken place.

Respectfully submitted,

/s/ *Vandy L. Jamison, Jr.*

Vandy L. Jamison, Jr.
9625 Pennsylvania Avenue
Upper Marlboro, MD  20772
Telephone: (202) 253-2876
Facsimile:  (301) 358-0101
E-mail:     vjamisonatlaw@aol.com